81 A.3d 830

**PHOENIXVILLE HOSPITAL**

**v.**

**WORKERS' COMPENSATION APPEAL BOARD (SHOAP).**

**Appeal of Annette Shoap.**

Supreme Court of Pennsylvania.

Argued March 7, 2012.

Decided Nov. 21, 2013.

28

Jonathan Picker, Esq., Picker Law Offices, for Annette Shoap.

Fred Harold Hait, Esq., Smigel, Anderson & Sacks, L.L.P., Harrisburg, for Pennsylvania Association for Justice.

Amber Marie Kenger, Esq., PA Department of Labor & Industry, Richard C. Lengler, Esq., Harrisburg, PA Department of Labor & Industry–WCOA, for Workers' Compensation Appeal Board.

Christopher Robert Bridgman, Esq., Carpenter, McCadden & Lane, L.L.P., for Phoenixville Hospital.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

We accepted review of this case to determine whether the Commonwealth Court erred in its interpretation of Section 306(b) of the Workers' Compensation Act ("Act"),[1] 77 P.S. § 512. Appellant, Annette Shoap, asserts that the Commonwealth Court erred by concluding that "substantial gainful employment exists" for purposes of granting a modification of her compensation benefits pursuant to Section 306(b), despite

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4; 2501–2626.

the fact that her application for the specific jobs involved failed to result in any offers of employment. Secondarily, Appellant argues that the Commonwealth Court, even if correct in its interpretation of Section 306(b), erred by not remanding the case for further evidentiary development based on its interpretation of Section 306(b), which Appellant contends represented a change in the standard for evaluating cases under that statute. After careful review, we reverse and remand.

Appellant sustained a work-related injury in the nature of a left shoulder injury while working as an employee of Phoenixville Hospital ("Employer"). She began receiving temporary total disability benefits pursuant to a Notice of Compensation Payable dated September 25, 2003. The treatment for Appellant's injury included three surgeries and physical therapy.

On August 9, 2007, Employer filed a modification petition alleging both that Appellant's physical condition had improved and that work was generally available to her within her physical restrictions in the relevant geographical area, as demonstrated by two labor market surveys. Appellant denied the material allegations of Employer's petition, and a hearing was held before a Workers' Compensation Judge ("WCJ").

At the hearing, Employer presented the testimony of Andrew Sattel, M.D., a board-certified orthopedic surgeon, who examined Appellant on May 9, 2007. Dr. Sattel opined that although Appellant has residual loss of function in her left shoulder, she was capable of performing sedentary work. Dr. Sattel also opined that Appellant was capable of performing the jobs described in the labor market surveys taken by Employer's vocational expert witness, Jeffrey Kimmich.

Mr. Kimmich, a certified rehabilitation counselor and vocational case manager, testified that he had met with Appellant and conducted a vocational interview. He also testified that, in two labor market surveys,[2] he had identified five jobs within

2. As discussed in more detail *infra*, Section 306(b)(2) contemplates an adjudicatory process that may involve "expert opinion evidence which includes job listings with agencies of the department, private job

Appellant's physical restrictions that were "open and available" in Appellant's usual employment area, and had forwarded this information to Appellant. These jobs were: (1) telephone sales representative, at $9.00 per hour, available on May 23, 2007; (2) telephone sales/appointment setter, at $8.00 to $10.00 per hour, available on June 18, 2007; (3) hotel night auditor, at $11.00 per hour, available on June 18, 2007; (4) hotel front desk clerk, at $9.00 to $10.00 per hour, available on July 9, 2007; and (5) telephone customer representative, at $7.15 per hour, available on July 31, 2007. Mr. Kimmich then testified that he calculated Appellant's earning power as corresponding to an average weekly wage of $347.41, based on an average of the wages of the five identified positions.

Appellant testified that in July 2007, she received Mr. Kimmich's labor market survey as to the first three of the positions, and had applied for each of them on July 30, 2007, entering copies of her respective written applications into evidence.[3] She further testified that she had never been contacted by any of these prospective employers, but also admitted on cross-examination that she had never inquired further about the positions after submitting her employment applications. Appellant additionally testified that in August 2007, she received Mr. Kimmich's labor market survey as to the remaining two positions and had immediately applied for each of them. She testified that she had telephone interviews with both of these prospective employers, and testified, without objection, that she was informed by the latter employer that she was not qualified for the position.[4] Appellant was not offered a position with either employer. Appellant further testified that although she had searched for other jobs adver-

placement agencies and advertisements in the usual employment area." 77 P.S. § 512(2).

3. Although Appellant applied for these jobs, she also testified that she had strong reservations about her ability to perform them because of her residual pain and impairment resulting from certain side effects of her medications.

4. Appellant's attempts to testify regarding what she had been told during the telephone interview with the first employer did not survive Employer's hearsay objections.

tised in the newspaper, the only jobs that she had applied for were the five identified by Mr. Kimmich. Finally, Appellant presented her own expert medical and vocational witnesses who testified that she was incapable of working at the positions Mr. Kimmich had identified in his labor market survey.

The WCJ issued a decision in which he credited the testimony of Dr. Sattel that Appellant was physically capable of performing any of the five jobs identified by Mr. Kimmich, further finding that Mr. Kimmich had indeed identified five jobs that were both compatible with Appellant's working restrictions and in the relevant geographical area. The WCJ rejected as less credible Appellant's expert medical and vocational witnesses. However, the WCJ also found credible Appellant's testimony that she had made a genuine effort to secure any one of the five of the jobs identified in the labor market survey, but had not received any offers of employment. The WCJ specifically determined that Appellant "has established that in good-faith [sic], she followed through on all of the jobs referred to her by Employer and that none of the referrals resulted in an offer of employment." WCJ Decision, dated 8/27/08, at 5, Conclusion of Law No. 3. For this reason, the WCJ determined that Employer had failed to establish its right to a modification of benefits under Section 306(b) of the Act and, accordingly, denied its modification petition.

On appeal to the Workers' Compensation Appeals Board ("WCAB"), Employer argued that, by concluding that Appellant had made a "good faith" but unsuccessful effort to secure any one of the five jobs listed in Employer's labor market survey, the WCJ had improperly incorporated into his legal analysis one of the requirements of *Kachinski v. Workmen's Compensation Appeal Board (Vepco Const. Co.)*, 516 Pa. 240, 532 A.2d 374 (1987). Employer asserted that the *Kachinski* requirements were no longer relevant in light of the subsequently enacted provisions of Section 306(b), which provide an approach toward a modification of benefits for claimants with partial disability differing from the approach laid out in *Kachinski*. In order to place Employer's argument, and the

WCAB's and Commonwealth Court's respective dispositions of it, in proper perspective, some background is required.

Prior to 1996, the Act was relatively silent regarding the manner of approaching an employer's claim that it is entitled to a modification of disability benefits where the claimant has regained some functional abilities and is capable of returning to some measure of gainful employment. In our 1987 *Kachinski* decision, this Court established guidelines for evaluating such cases as follows:

1. The employer who seeks to modify a claimant's benefits on the basis that he has recovered some or all of his ability must first produce medical evidence of a change in condition.

2. The employer must then produce evidence of a referral (or referrals) to a then open job (or jobs), which fits in the occupational category for which the claimant has been given medical clearance, *e.g.*, light work, sedentary work, etc.

3. The claimant must then demonstrate that he has *in good faith* followed through on the job referral(s).

4. If the referral fails to result in a job[,] then claimant's benefits should continue.

*Id.* at 380 (emphasis added).

Further, we observed that the above guidelines could create a viable system only when all parties, including employers by referring a serious, productive employment possibility, acted in "good faith," and, by so doing, created an environment where an injured employee could return to "productive employment." *Id.*

In 1996, the Act of June 24, 1996, P.L. 350 ("Act 57") substantially amended Section 306(b) of the Act, renumbering it Section 306(b)(1) and adding Section 306(b)(2) and (3). Amended Section 306(b)(1) establishes that partial disability compensation benefits shall be based on the difference between the claimant's pre-injury wage and her or his "earning power." 77 P.S. § 512(1). Section 306(b)(2) defines "earning power" as "the work the employe is capable of performing and

shall be based upon expert opinion evidence which includes job listings with agencies of the department, private job placement agencies, and advertisements in the usual employment area." 77 P.S. § 512(2). Section 306(b)(2) also provides that partial disability "shall apply" if the claimant "is able to perform his previous work or can, considering [her or his] residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area" where the claimant lives in Pennsylvania. *Id.*

Because Section 306(b)(2) did not include the *Kachinski* requirement that an employer must prove that the claimant was *referred* to an appropriate "then open job" (except, as noted *infra,* when the employer itself has an appropriate open position), Employer argued before the WCAB that it was irrelevant that Appellant had shown "good faith" in applying for the five jobs listed in Mr. Kimmich's labor market surveys. The WCAB, however, rejected this argument, opining that the WCJ's decision did not, as Employer asserted, incorporate the *Kachinski* standards into the analysis, even though "good faith" pursuit of specific employment is one of the elements of *Kachinski.* Rather, the WCAB determined that "a fair reading" of the WCJ's decision "shows that the WCJ used the words [']good faith['] to show that [Appellant had] made a genuine effort to secure the positions located by [Employer's] vocational expert." WCAB Decision, dated 10/14/09, at 7 n.1.

Regarding the question of whether the WCJ's decision should otherwise be upheld pursuant to Section 306(b), the WCAB noted that the WCJ's decision was in conformity with *South Hills Health System v. Workers' Compensation Appeal Board (Kiefer),* 806 A.2d 962 (Pa.Cmwlth.2002), from which the WCAB quoted at length. More specifically, the WCAB observed that *South Hills* determined that the reference in Section 306(b) to jobs that "exist" must be interpreted to mean jobs that do not just " 'exist' but 'exist' in reality and are open and available to a claimant." WCAB Decision at 5 (quoting *South Hills, supra* at 969). Thus, the WCAB concluded that modification of benefits could not be based simply on whether

Employer had identified job listings within Appellant's physical requirements and geographic location, as Employer advocated, when Appellant had produced credible evidence that the jobs were in actuality not available to her, and thus did not "exist in reality." The WCAB held:

By taking the initiative and applying in good faith for the positions, [Appellant here] put the findings of the labor market survey to the test and demonstrated that the jobs listed therein were not, in reality, available to her. Hence, we conclude that the positions did not exist for [Appellant] and that the WCJ correctly denied [Employer's] Modification Petition.

*Id.* at 7.

On further appeal, the Commonwealth Court reversed. *Phoenixville Hospital v. Workers' Compensation Appeal Board (Shoap)*, 2 A.3d 689 (Pa.Cmwlth.2010). The court noted that *South Hills*, among other things, opined that an employer could not satisfy its burden under Section 306(b) by simply providing proof of a working environment in the relevant geographic area involving positions that someone with the claimant's physical limitations could perform, but which were currently filled by other individuals. That is, an employer must do more than show that there are people in the relevant geographic area who are working at jobs within the claimant's physical and vocational restrictions. Rather, the employer must show the existence of "available" positions at the time its expert conducted the labor market survey in question.[5] The court further observed, however, that *South Hills* did not address the issue raised by the present case: whether jobs are "available" to a claimant for purposes of

5. The Commonwealth Court also noted, however, that these principles were expressed as "dicta" and not as the foundational basis of *South Hills*, even though the Commonwealth Court here, like the WCAB, quoted such "dicta" from *South Hills* at length, with approval. *Phoenixville Hospital, supra* at 694–95. However, the Commonwealth Court also observed that these *South Hills* principles were adopted, or at least discussed, as substantive law in several subsequent Commonwealth Court decisions. *Id.* at 695 (citing, *e.g., Edwards v. Workers' Compensation Appeal Board (MPW Indus. Serv., Inc.)*, 858 A.2d 648 (Pa.Cmwlth. 2004)).

Section 306(b) when the jobs are advertised, the claimant applies for all of the jobs identified in the employer's labor market survey, the claimant does not receive any offer of employment, and the employer's vocational expert is found credible regarding her or his testimony that the specific jobs were actually open, and thus available, at the time the survey was made. *Phoenixville Hospital, supra* at 696.

The Commonwealth Court determined that the critical question under Section 306(b) was not whether the claimant applied for and was offered a listed job; rather, the critical question was whether the jobs identified by the employer's vocational expert witness were actually open and available to anyone having the claimant's physical limitations and other qualifications *at the time* of the labor market survey. The court gave several reasons for this determination, namely, that (1) the employer could not be held accountable based on a claimant's possibly untimely application for the listed jobs; (2) such "open and available" jobs showed that *similar* positions existed or would likely open; and (3) the Act places a burden on the claimant to actively look for work once cleared for such activity, without regard to receipt of the employer's labor market survey.[6] *Id.* at 697–98.

In coming to this decision, the Commonwealth Court rejected any suggestion that Employer's labor market surveys were analogous to the job referrals described in *Kachinski,* which case, the Commonwealth Court opined, now presented an "antiquated standard." *Id.* at 697. Following this thread, the Commonwealth Court then stated that it was "of no relevance" that the WCJ had concluded that Appellant had "followed through" on Employer's job listings in "good faith." *Id.* The court held that because Employer had established that the jobs identified by Mr. Kimmich were open and available at the time he had conducted his earning power assessment · of Appellant, Employer had satisfied its burden under Section 306(b), whereby the jobs listed provided the required approximation of Appellant's earning power. *Id.* Accordingly, the

6. *See* 77 P.S. § 512(3)(ii) ("[T]he employe has an obligation to look for available employment.").

Commonwealth Court reversed the WCAB and ordered a modification of benefits based on Appellant's earning power of $347.41 per week, as calculated by Mr. Kimmich.

In reaching its determination, however, the Commonwealth Court also noted that it would not consider the final job identified by Mr. Kimmich (telephone customer representative, at $7.15 per hour, available on July 31, 2007) for the following reason:

> [Appellant] *presented definitive, unrebutted testimony* that this position *continued* to be open and available when she pursued employment with this business. She interviewed over the phone and was not offered a job. Consistent with *South Hills,* [this] job ... "existed," but it was not "available" to [Appellant].

*Id.* at 697 n. 12 (emphasis in original).[7]

We accepted for review the following two issues:

(a) Did the Commonwealth Court err and misinterpret the meaning of § 306(b)(2) of the Workers' Compensation Act, 77 P.S. § 512(2)[,] in determining that a job is available to a claimant for purposes of said Act even when a claimant applies to each individual job contained in a labor market survey and does not receive an offer of employment?

(b) Did the Commonwealth Court err in failing to remand the matter to the Workers' Compensation Judge for a determination of whether or not the jobs identified by the employer's vocational expert were open and available in light of the fact that the holding of the Commonwealth Court in the within matter altered the status of the law at the time of the decision rendered by the Workers' Compensation Judge?

7. Because this was the lowest paying of the five jobs in Employer's labor market survey, the Commonwealth Court observed that its inclusion in Mr. Kimmich's calculation of Appellant's earning power only inured to Appellant's benefit. Moreover, the court noted that Employer had specifically asked only that Appellant's benefits be modified based on Mr. Kimmich's calculation of earning power of $347.71 per week, not on any possible increase in earning power based on the record. *Phoenixville Hospital, supra* at 698.

*Phoenixville Hospital v. Workers' Compensation Appeal Board (Shoap)*, 610 Pa. 203, 18 A.3d 1093 (2011) (*per curiam* ).

Our standard of review of an agency decision is limited to determining whether there has been a constitutional violation, an error of law, or a violation of agency procedure, and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Pieper v. Ametek–Thermox Instruments Division*, 526 Pa. 25, 584 A.2d 301, 303 (1990). When, as here, the issue is the proper interpretation of a statute, it poses a question of law; thus, our standard of review is *de novo*, and the scope of our review is plenary. *Borough of Heidelberg v. Workers' Compensation Appeal Board (Selva)*, 593 Pa. 174, 928 A.2d 1006, 1009 (2007). Further, "[o]ur basic premise in work[ers'] compensation matters is that the Work[ers'] Compensation Act is remedial in nature and intended to benefit the worker, and, therefore, the Act must be liberally construed to effectuate its humanitarian objectives." *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.)*, 575 Pa. 66, 834 A.2d 524, 528 (2003) (quoting *Peterson v. Workmen's Compensation Appeal Board (PRN Nursing Agency)*, 528 Pa. 279, 597 A.2d 1116, 1120 (1991)). "Accordingly, borderline interpretations of the Act are to be construed in the injured party's favor." *Id.* (quoting *Harper & Collins v. Workmen's Compensation Appeal Board (Brown)*, 543 Pa. 484, 672 A.2d 1319, 1321 (1996)).

Appellant argues generally that amended Section 306(b) did not replace the *Kachinski* requirements or eliminate its role in evaluating partial disability cases, noting that this Court has not wholly abandoned the *Kachinski* principles.[8] More specifically, she contends that the concept of jobs that "exist," as provided for in Section 306(b)(2), is unclear; therefore, applying the *Kachinski* test leads to a reasonable clarity of the concept. Along these lines, Appellant relies upon the analysis

8. *See, e.g., Lewis v. Workers' Compensation Appeal Board (Giles & Ransome, Inc.)*, 591 Pa. 490, 919 A.2d 922, 927 (2007) (wherein we "recognized the continuing vitality of the *Kachinski* requirement of [the employer] demonstrating a change in [the claimant's] physical condition" in order to support a modification of benefits).

set forth in *South Hills, supra,* to wit, that Section 306(b) must be read as contemplating jobs that " 'exist' in reality and [that] are open and available to a claimant." *Id.* at 969. In this view, Appellant asserts that an employer is required under Section 306(b) to make a referral to a claimant of jobs that would be "available" to that claimant. As further proof of her argument, Appellant asserts that it defies logic for administrative rules to require timely service of labor market surveys upon claimants if evidence of the fruits of applications for jobs listed in the survey may not be considered as substantive evidence. *See* 34 Pa.Code § 123.204(c) ("A vocational expert who authors additional written reports, including earning power assessments or labor market surveys, shall simultaneously serve copies of these written reports upon the employee and counsel, if known, when the expert provides the written reports upon the insurer or its counsel.").

Additionally, Appellant argues that the Commonwealth Court's interpretation of Section 306(b) places claimants in an unfair and unrealistic position in that they will be required to take the cost-prohibitive step of hiring vocational experts of their own to oppose the employer's proof, rather than relying on evidence of their own good faith, but unsuccessful, efforts to obtain the employment that the employer has identified. Appellant asserts that this circumstance violates the precept that the Act is to be interpreted in a manner to achieve its humanitarian purposes. *See Hannaberry, supra* at 528. Finally, Appellant contends that had the legislature intended for Section 306(b) to replace the *Kachinski* test, or the concepts that are addressed by it, the legislature would have specifically indicated such in the legislation itself.[9]

9. Appellant secondarily argues that even if this Court affirms the interpretation of Section 306(b) made by the Commonwealth Court, the appropriate remedy would be to remand the case to the WCJ for further evidentiary hearings that incorporate the "new" Section 306(b) standard. Appellant contends that had the Commonwealth Court remanded the case, she would have considered bringing forward additional evidence regarding the actual availability of the jobs listed in Employer's labor market surveys, including evidence from the potential employers themselves.

*Amicus curiae,* the Pennsylvania Association for Justice (the "Association"), filed a brief in support of Appellant's appeal. The Association argues that it is illogical to interpret Section 306(b)(2) in any manner other than that its concept of jobs that "exist" must mean gainful employment that is open and available to a claimant; otherwise, the statute's reference to "job listings" would be mere surplusage. Further, the Association contends that Appellant's evidence in this case that there was no offer of employment following her application for the jobs listed in the labor market surveys is simply a relevant and effective way to test the credibility of Employer's earning power assessment. Such evidence goes to the heart of the issue of whether jobs are open and available to a claimant, and a WCJ is capable of making the appropriate credibility determinations when presented with such evidence, as the WCJ did in the instant case.

Employer argues that had the legislature *not* intended for Section 306(b)(2) to replace the *Kachinski* requirements, it would have so stated in the legislation, noting that until the amendment of Section 306(b) and the addition of Section 306(b)(2), *Kachinski* was the law of the Commonwealth. In support, Employer cites *Riddle v. Workers' Compensation Appeal Board (Allegheny City Electric, Inc.),* 603 Pa. 74, 981 A.2d 1288 (2009), wherein we noted that "[b]y adopting [Section 306(b)(2)], the legislature lowered the *Kachinski* burden of proof by allowing an employer to obtain modification or suspension of benefits on evidence of earning power proved through expert testimony rather than by providing evidence that the claimant had obtained employment.... In this sense, the legislature replaced this Court's *Kachinski* approach." *Id.* at 1293 n. 8. Based on this view, Employer contends that any potential application of *Kachinski* to a Section 306(b) analysis, when the statute itself does not incorporate the *Kachinski* requirements, effectively results in a judicial repeal of the statute.[10] Employer contends that with *Kachinski* removed

10. Employer does not advocate the overturning of *Kachinski,* noting that this case remains viable for cases predating the effective date of

from the analysis, it is clear that the Commonwealth Court correctly determined that Employer had established its right to a modification of benefits under the specific provisions of Section 306(b).

Our task is to interpret Section 306(b); thus, we are guided by the principles set forth in the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991. Accordingly, we begin with the precept that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a).

■ Generally, the best indication of legislative intent is the statute's plain language. *Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board,* 601 Pa. 449, 974 A.2d 1144, 1149 (2009). We look to the language of the statute, which, if plain and clear, we simply apply; we may not disregard a statute's plain language in order to pursue the statute's spirit. 1 Pa.C.S. § 1921(b). However, our review also must take into account the precepts that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable, and that the General Assembly intends the entire statute to be effective and certain. 1 Pa.C.S. § 1922(1), (2).

■ Where words of a statute are not explicit, but ambiguous,[11] a reviewing court engages in a statutory construction analysis that considers "among other matters:"

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

Section 306(b)(2) and cases where an employer chooses to seek modification of benefits pursuant to *Kachinski.*

11. Words of a statute are ambiguous when there are at least two reasonable interpretations of the text under review. *Delaware County v. First Union Corp.,* 605 Pa. 547, 992 A.2d 112, 118 (2010); *Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325, 332 (1987).

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

As the arguments of the parties and the analysis of the Commonwealth Court make plain, *Kachinski's* shadow falls upon this case to some degree or another-but it must be emphasized that *Kachinski* is not the initial or central focus of our inquiry. Fundamentally, our task is to interpret and apply a statute that makes no mention of *Kachinski.* The legislature did not explicitly abrogate *Kachinski* with its amendment of Section 306(b), nor did it state or explicitly suggest that Section 306(b) was to be interpreted in tandem with *Kachinski.* Because the present case was brought under Section 306(b), we look first to the provisions of that section and any other section of the Act that may be relevant for the proper disposition of the case. If the statutory language is plain, we apply its language to the factual scenario, which then may obviate any need to discuss *Kachinski* at all. If, however-er, the statutory language is ambiguous, then *Kachinski,* as an expression of existing law at the time of Section 306(b)'s enactment, would be one of several matters we might consider under 1 Pa.C.S. § 1921(c), albeit a potentially very important one. With this understanding, we now look to the relevant statutory provisions in detail.

■ We begin not with Section 306(b), but with Section 413 of the Act, which generally provides that a party seeking modification of benefits must demonstrate "that the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased." 77 P.S. § 772. Pursuant to Section 413, when an employer seeks to modify a claimant's benefits by a reduction, suspension, or termination of such benefits, the employer must first come forward with medical evidence of a change in the claimant's physical condition that

correspondingly establishes a change in the claimant's "disability." *See, e.g., Lewis v. Workers' Compensation Appeal Board (Giles & Ransome, Inc.),* 591 Pa. 490, 919 A.2d 922, 926 (2007). "Disability" is understood under the Act as "the loss of earning power" caused by the work injury. *Id.*

Section 306(b) directly addresses the issue of partial disability and its correlation to earning power. Section 306(b)(1) provides, among other things, that compensation for partially disabled claimants shall be based generally on the difference between the claimant's pre-injury wages and her or his post-injury "earning power." Section 306(b)(2), containing the essence of the amended legislation, then discusses what the legislature means by "earning power," as follows:

(2) "Earning power" shall be determined by the work the employe is capable of performing and shall be based upon expert opinion evidence which includes job listings with agencies of the department, private job placement agencies and advertisements in the usual employment area. Disability partial in character shall apply if the employe is able to perform his previous work or can, considering the employe's residual productive skill, education, age and work experience, *engage* in any other kind of substantial gainful employment *which exists* in the usual employment area in which the employe lives within this Commonwealth. If the employe does not live in this Commonwealth, then the usual employment area where the injury occurred shall apply. If the employer has a specific job vacancy the employe is capable of performing, the employer *shall* offer such job to the employe. In order to accurately assess the earning power of the employe, the insurer may require the employe to submit to an interview by a vocational expert who is selected by the insurer and who meets the minimum qualifications established by the [Department of Labor and Industry ("Department")] through regulation. The vocational expert shall comply with the Code of Professional Ethics for Rehabilitation Counselors pertaining to the conduct of expert witnesses.

77 P.S. § 512(2) (emphases added).[12]

Breaking this section into its component parts, we observe that "earning power" is calculated from the "work the employe is capable of performing." *Id.* Such calculation "shall be based upon expert opinion evidence," which evidence "includes job listings with the agencies of the [Department], private job placement agencies[,] and advertisements in the usual employment area." *Id.* Partial disability "shall apply" if the claimant is able to either (1) work his pre-injury job; or (2) "engage in any other kind of *substantial gainful employment which exists* " in the relevant geographic area and which takes into consideration several factors, namely, the claimant's residual ability, education, age, and work experience. *Id.* (emphasis added). Section 306(b)(2) further places upon the employer the responsibility of offering the claimant a job if the employer has a vacancy that the claimant is capable of filling. *Id.*

██ We immediately recognize that Section 306(b) does *not* require that the claimant be offered a job in order to establish the claimant's earning power, except in the case where the employer itself has an appropriate opening. Earning power under Section 306(b) is unmistakably based on the employer's evidence of the claimant's ability to engage in existing "substantial gainful employment" within his or her physical, medi-

12. Additionally, Section 306(b)(2.1) provides that if the employer (or, rather, its insurer) has a financial interest in connection with the vocational expert used by the employer to perform an earning power assessment, then this information must be disclosed to the claimant prior to the employer's referral to this expert. Finally, Section 306(b)(3) provides:

(3) If the insurer receives medical evidence that the claimant is able to return to work in any capacity, then the insurer must provide prompt written notice, on a form prescribed by the department, to the claimant, which states all of the following:
(i) The nature of the employe's physical condition or change of condition.
(ii) That the employe has an obligation to look for available employment.
(iii) That *proof* of available employment opportunities may jeopardize the employe's right to receipt of ongoing benefits.
(iv) That the employe has the right to consult with an attorney *in order to obtain evidence to challenge the insurer's contentions.*

77 P.S. § 512(3) (emphases added).

cal, and vocational restrictions or skills, not on whether he or she actually receives a job offer.[13] Thus, an employer need not show that the claimant had obtained employment.

However, other aspects of the employer's burden under Section 306(b) are less clear, and are indeed ambiguous as the well-developed arguments of the parties establish, as this case places at the fore the question of what Section 306(b) intends by the phrase "substantial gainful employment that exists." Specifically, we must analyze whether this phrase supports the determination that an employer's proof is complete under Section 306(b) when the employer's expert witness proves that she or he has found one or more employment opportunities compatible with the claimant's established physical and voca-tional abilities from job listings with agencies of the depart-ment, private job placement agencies and advertisements in the usual employment area. This is the position taken by Employer in the instant case. Here, Employer contends that, because the WCJ accepted Employer's relevant proof over Appellant's conflicting evidence indicating that she was not physically capable of performing the jobs listed in Employer's labor market surveys, this circumstance effectively ends the matter, and accordingly, Employer prevails under Section 306(b), rendering irrelevant Appellant's testimony concerning her lack of success in her good faith efforts to obtain one of these jobs.

██ A more reasonable reading of Section 306(b), however, and one that comports with a commonsense reading of "sub-stantial gainful employment that exists," as well as the Act's humanitarian purposes,[14] is that the proof required to reduce or suspend a claimant's benefits must rest upon the existence of meaningful employment opportunities, and not the simple identification of jobs found in want ads or employment listings. *See* 77 P.S. § 512(3)(iii) ("proof of *available* employment op-

---

**13.** In this regard, Section 306(b) evidences a significant departure from the requirements that *Kachinski* imposes before an employer can effec-tuate a reduction in benefits.

**14.** *See Hannaberry, supra* at 528.

portunities may jeopardize the employe's right to receipt of ongoing benefits.") (emphasis added).

 An employer must prove a claimant's earning capacity (absent an offer of employment with the employer) with evidence that potential employers are in search of an employee (as evidenced by, among other things, job listings, placement agencies, or advertisements) within the claimant's physical, medical, and vocational restrictions. We agree, however, with the Commonwealth Court in *South Hills, supra* at 969, that the legislature's choice of the words "job listings," "placement agencies," and "advertisements" to prove earning capacity evidences the legislature's intent that the employer must prove the existence of *open* jobs that the claimant is capable of filling, not simply the existence of jobs that are already filled with individuals having the same physical, medical, and vocational restrictions as the claimant. The jobs identified by the employer's expert witness that the claimant is "capable of performing" must thus be those jobs that are actually open and potentially available, not simply jobs that are already filled with existing employees. As the Commonwealth Court has observed:

Although the General Assembly, in adopting Act 57, apparently intended to alter the burden placed previously upon employers seeking modification of benefits, this Court cannot agree ... that the amendment contemplates that employers may establish earning power through evidence of positions that do "exist" but which are unavailable to a claimant because someone else is working in those positions. *Such a view would defeat the very purpose of the Act.* By its listing of sources of positions (*i.e.*, "agencies of the department, private job placement agencies and advertisements in the usual employment area," 77 P.S. § 512(2)), it is evident that the General Assembly intended the concept of the term "existing" to mean positions that are available, because it is not likely that those sources would list positions that are not open and available. If the General Assembly had intended the term "existing" to mean job classifications and positions which "exist" in the workplace in the abstract, but are filled

by other people in the workforce, it could easily have so stated. We therefore conclude that the General Assembly could not have intended an employer's burden to be so limited. An injured employee is "disabled" because that employee cannot perform his or her pre[-]injury job, and that employee's disability is not removed because someone else is working in a job that the claimant can perform, but cannot obtain because it is unavailable; succinctly stated, it does not "exist" for that employee.

*South Hills, supra* at 969–70 (emphasis added).

With respect to the Commonwealth Court's observation that had the General Assembly "intended the term 'existing' to mean job classifications and positions which 'exist' in the workplace in the abstract, but are filled by other people in the workforce, it could easily have so stated," we note that there did exist a prior—and clearly rejected—version of the bill that ultimately became Act 57 that included a limitation on the employer's proof to abstractions. The original bill proposed in the House of Representatives stated in relevant part:

(2) "Earning power" *shall be determined irrespective of the actual availability of work the employe is capable of performing* and shall be based upon expert opinion evidence. Disability partial in character shall apply if the employe is able to perform his previous work, or can, considering the employe's residual productive skill, education and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employe lives within this Commonwealth, *regardless of whether a specific job vacancy exists for him or whether he would be hired if he applied for work*.... As used in this paragraph "substantial employment" means work activity that involves doing significant and productive physical or mental activities, regardless whether it is done on a part-time basis or whether the claimant does less, gets paid less, or has less responsibility, than when the claimant worked before. As used in this paragraph, "gainful employment" is any work activity that is done for pay or profit, whether or not a profit is realized.....

*See* H.B. 22 16, Gen. Assem., 1995–1996 Reg. Sess. (Pa.1995) (emphases added).

Thus, we conclude that the version of Section 306(b) that was ultimately enacted, in contrast with the prior, rejected version, evidences the General Assembly's salutary intent that proof of substantial gainful employment must be based on the existence of meaningful opportunities for the claimant to obtain employment. It therefore follows that expert opinion evidence under Section 306(b) functions not only as a means of demonstrating that there are open jobs that exist within the claimant's limitations, but also as a mechanism for providing the claimant with notice of the existence of these jobs, which thus provides a serious opportunity to secure employment.[15] Accordingly, a claimant must have latitude wider than that allowed by the Commonwealth Court here to present evidence regarding her or his experience with applying for the jobs identified by the employer's expert witness.

 A claimant indisputably may show that the employer's labor market surveys were simply based on unsubstantiated, erroneous, conflicting, false, or misleading information,[16] and evidence regarding the claimant's actual experience with the employers identified in the employer's labor market surveys may lend support for establishing contentions along these lines. Additionally, because an employer is required to establish the existence of substantial gainful employment that is compatible with the claimant's residual productive skills, education, age, and work experience, it would be directly relevant for a claimant to show that an employer rejected the claimant's job application precisely because the work is incompati-

15. *See also* 34 Pa.Code § 123.204(c) (emphasis added) ("A vocational expert who authors additional written reports, including earning power assessments or labor market surveys, shall *simultaneously serve copies* of these written reports upon the employee and counsel, if known, when the expert provides the written reports upon the insurer or its counsel.").

16. *See generally* Foley, Michael J., *Funded Employment and Vocational Rehabilitation Shams Affecting Injured Workers,* 2 Ann. 2000 ATLA–CLE 2845 (2000).

ble with the claimant's residual productive skills, education, age, or work experience.[17]

In addition, however, in order for the term "substantial gainful employment which exists" to be meaningful within the context of the goals of the Act, it must encompass more than the mere existence of jobs compatible with a claimant's restrictions that happen to be open at the time they are discovered by the employer's expert witness, as the Commonwealth Court held in this case. The statutory concept of "substantial gainful employment which exists" would be meaningless with respect to a claimant's actual medical and vocational circumstances unless the jobs identified by the employer's expert witness, which are used as the employer's proof of earning power under Section 306(b), remain open until such time as the claimant is afforded a reasonable opportunity to apply for them. Otherwise, the legislatively selected terms "earning *power*," "*substantial gainful* employment" and "exists," would become mockeries of their commonly understood meanings. *See* 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to ... their common and approved usage"). Among other things, the Commonwealth Court's holding could lead to the absurdity of an employer identifying one "open" job and using it to establish earning power for a number of "eligible" claimants, when clearly at most only one of these claimants could actually have the opportunity to achieve "substantial gainful employment" via this one opening. *See* 1 Pa.C.S. § 1922(1) (providing that statutes should be

17. In the instant case, for example, the Commonwealth Court determined that an "existing" job was not "available" for purposes of Section 306(b) because Appellant established that she had applied and was interviewed for the job, but was told by the potential employer that she would not be hired. *See Phoenixville Hospital*, 2 A.3d at 697 n. 12. The WCJ made no specific factual findings as to why Appellant was not hired for this position. We note parenthetically, however, that Appellant testified without objection that she had been informed during her telephone interview with the prospective employer that she was not qualified for the job because of her lack of familiarity with a certain computer program. *See* Notes of Testimony, 6/17/08, at 27–28. Arguably, Appellant presented evidence in this instance that the job was not within her vocational restrictions, even if it may have been within her physical or medical restrictions.

interpreted in a manner that presumes that the General Assembly did not intend an absurd result).

We are aware that Act 57 was intended to modify the evidentiary burden on the employer for cases involving partial disability,[18] and we reject Appellant's argument that *Kachinski*, with its requirement that the claimant be referred to an open job and receive a job offer, should be used to re-interpret what Section 306(b)(2) requires an employer to prove. The statute's language does not track *Kachinski*, and quite plainly, Section 306(b) is not a codification of *Kachinski*. Significantly, *Kachinski* required the employer to *refer* a specific job to the claimant, which job, if obtained, or if rejected in bad faith by the claimant, established a basis for determining the amount of the claimant's partial disability benefits. By contrast, Section 306(b)(2) requires the employer to *identify* specific jobs. *See Riddle*, 981 A.2d at 1293 n. 8 (emphasis added) ("By adopting [Section 306(b)(2)], the legislature lowered the *Kachinski* burden of proof by allowing an employer to obtain modification or suspension of benefits on evidence of earning power proved through expert testimony *rather than by providing evidence that the claimant had obtained employment....* In this sense, the legislature replaced this Court's *Kachinski* approach.").

 With this understanding, we turn to the claimant's opportunity to submit evidence regarding her or his experience in pursuing the jobs identified by the employer's vocational expert witness, which evidence was substantially prohibited by the Commonwealth Court in the instant case. *See* 77 P.S. § 512(3)(iv) (a claimant "has the right to consult with an attorney in order to obtain evidence to challenge the insurer's contentions"). Evidence that the claimant pursued but failed to obtain gainful employment with the employers identified by the expert witness is undeniably relevant to rebut the employer's argument that the positions identified were proof of the

18. *See, generally, Kramer v. Workers' Compensation Appeal Board (Rite Aid Corp.),* 584 Pa.309, 883 A.2d 518, 534–36 (2005) (noting that Act 57 significantly concerned itself with the containment of costs borne by employers in our workers' compensation scheme).

potentiality of a claimant's substantial gainful employment. However, such evidence is, of course, not dispositive of the earning power inquiry. Moreover, a claimant must be afforded the opportunity to submit evidence that she or he did not obtain employment because the position identified by the employer's expert witness was already filled by the time the claimant had had a reasonable opportunity to apply for it. If the job is already filled, it does not "exist," to afford Section 306(b)'s language its commonly understood meaning.

The WCJ is charged with finding the facts necessary to support her or his decision that disposes of the motion to be decided. Whether a claimant had a "reasonable opportunity" to apply and did, in fact, apply for an identified position (and whether the job was already filled by the relevant time) are factual matters that the WCJ is fully qualified to determine.[19] Moreover, *Kachinski's* focus upon the requirement that both the employer and the claimant act in good faith in order for the intended system to function assuredly applies with equal force with respect to the parties' duties and burdens under Section 306(b). Therefore, the WCJ in the instant matter, as the WCAB had observed, did not stray beyond the limits of Section 306(b) by making the relevant finding that Appellant had applied for the five positions identified in Mr. Kimmich's labor market surveys in "good faith."

However, we also observe that Appellant was not afforded the opportunity to fully develop her proof as described in this Opinion. Accordingly, we reverse the order of the Commonwealth Court and remand this case for disposition in a manner consistent with this Opinion.[20]

Jurisdiction relinquished.

19. We observe that it would only be the motivated claimant who would be able to offer admissible evidence regarding these matters. Not all claimants would actually pursue employment opportunities presented to them, as Appellant did here.

20. Remand is an appropriate remedy when a court announces a new standard to be applied to the facts of a case. *See Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027, 1039 (1980); *Cuevas v. Platers &*

Former Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices BAER and TODD join the opinion.

Justice SAYLOR files a dissenting opinion in which Justice EAKIN joins.

Justice SAYLOR, dissenting.

As I read the majority opinion, it authorizes claimants defending against modification to rebut employers' expert evidence concerning the availability of suitable employment in the marketplace, adduced per Section 306(b)(2), with evidence of claimants' good-faith efforts to obtain work. In my view, however, the statute rather straightforwardly alters the landscape of modification inquiries by shifting the focus from actual availability of a job to the claimant (which was the focus under the *Kachinski* regime) to the existence of jobs in the marketplace suitable to claimants' vocational skills and medical restrictions. Further, I agree with Employer that the majority's construction of Section 306(b)(2) circles back to the *Kachinski* regime, undermining the General Assembly's effort—via the Act 57 amendments to the workers' compensation scheme—to prospectively redirect modification inquiries away from the previously prevailing concern with claimants' follow-through experience with job referrals.

Initially, the majority devotes a considerable portion of its opinion to demonstrating that Section 306(b)(2) requires evidence of "open" jobs, as opposed to jobs "already filled with existing employees." Majority Opinion, at 46, 81 A.3d at 843. I agree and merely add that no party to this litigation has challenged this proposition. Indeed, Employer expressly endorses the existing Commonwealth Court precedent on the subject. *See* Brief for Employer at 14 (indicating that " 'exists' means the employer has a position available and the employer is hiring for the position" (citing *South Hills Health Sys. v. WCAB (Kiefer)*, 806 A.2d 962, 969–70 (Pa.Cmwlth.

Coaters, Inc., *464 Pa. 35, 346 A.2d 6, 9 (1975)*; Querry v. Pennsylvania Glass Sand Corp., *24 Pa.Cmwlth. 225, 354 A.2d 600, 603–04 (1976)*.

2002))). The dispute which is presented in this appeal concerns the degree to which expert testimony about open jobs in the marketplace may be rebutted with evidence of claimants' anecdotal experiences.

In a scenario such as the present one, in which an employer seeks to modify benefits from compensation for total to partial disability, modification is appropriate where a claimant has regained a degree of "earning power." 77 P.S. § 512.[1] Prior to the Act 57 amendments, the Workers' Compensation Act offered little by way of further guidance concerning the substantive requirements for modification based on an asserted changed in earning power. This void left open many questions, including "whether an employer can sustain his burden of showing available work by demonstrating the existence of jobs in the marketplace, as opposed to demonstrating jobs which have actually been made available to the claimant." *Kachinski v. WCAB (Vepco Constr. Co.)*, 516 Pa. 240, 244, 532 A.2d 374, 376 (1987). The critical determination of *Kachinski* was that *"actual availability "* of work was required, *id.* at 251, 532 A.2d at 379 (emphasis added), and the Court provided further guidance concerning how such actual availability was to be established. *See id.*

Act 57, however, by its plain terms, materially alters this previous understanding of the key conception of "earning power" via the explicit directives that earning power "shall be determined by the work the employe is *capable of performing "* and that it "shall be based on *expert opinion evidence....* " 77 P.S. § 512(2) (emphasis added). Thus, the Legislature has now specifically directed that earning power is to be assessed according to jobs in the marketplace, not actual availability of a particular job or jobs to a particular claimant.[2]

1. *See generally Dillon v. WCAB (Greenwich Collieries)*, 536 Pa. 490, 503, 640 A.2d 386, 392 (1994) ("[A]n award of benefits for partial disability may be viewed as a 'partial suspension' of benefits: the causal connection has been established, the employer's liability for the injury has not terminated but the claimant's earning power is such that benefits for total disability are not necessary, benefits for partial disability being sufficient.").

2. The exception, of course, is the requirement for an employer to offer a suitable job to the claimant if there is one available with the employer. *See* 77 P.S. § 512(2).

Such understanding is bolstered by the further prescription, in Section 306(b)(2), that the salient expert opinion evidence includes "job listings with agencies of the department, private job placement agencies and advertisements in the usual employment area." *Id.*

Nevertheless, it is Claimant's position (and that of the majority at least as I read its opinion) that the plain meaning and implication of the above prescriptions of Section 306(b)(2) should not be enforced consistently, since the statute proceeds to indicate that partial disability applies if the employee can engage in other substantial gainful employment which "exists" in the relevant employment area. *Id.* The Legislature's use of the word "exists," however, is wholly consonant with its emphasis upon jobs in the marketplace. In other words, jobs exist if they are proven to exist through credited expert testimony reflecting a labor market survey. The approach to the word "exists" posited by Claimant and the majority digresses toward the *Kachinski* requirement of actual availability to specific claimants, thus thwarting the legislative redirection of the modification inquiry.

To the degree the word "exists" fosters any ambiguity in Section 306(b)(2)'s otherwise clear and straightforward focus on the job market, principles of statutory construction also support the conclusion that the Legislature intended a job-market perspective to control, as opposed to one centering on actual availability. Turning first to the occasion for the statute, the mischief to be remedied, the object to be attained, and the contemporaneous legislative history, *see* 1 Pa.C.S. § 1921(c)(1), (3), (4), (7), I appreciate that the Act, as a whole, is intended to benefit the worker. *See, e.g., Hannaberry HVAC v. WCAB (Snyder, Jr.)*, 575 Pa. 66, 73, 834 A.2d 524, 528 (2003). However, the enactment of Act 57 was precipitated primarily by concerns with the rising cost of workers' compensation insurance and the concomitant loss of business to other states. *See, e.g.,* S. Legis. J., 1996 Reg. Sess. 2034 (June 5, 1996) (statement of Sen. Loeper) ("[I]f you talk to people and ask, what is your number one concern in Pennsylvania in conducting business and keeping business and keep-

ing jobs, I think the answer you will hear is the rates of workers' compensation insurance premium costs."). Indeed, Act 57 was introduced as a method of balancing the interests of injured workers with employers' financial concerns. *See, e.g.,* H. Legis. J., 1996 Reg. Sess. 1602 (June 19, 1996) (statement of Rep. Perzel) ("This legislation is reasonable—it reflects a blending of concern for Pennsylvania's economic position and our historic commitment to workers who are injured on the job."). Notably, several legislators also mentioned that Act 57 would discourage fraud and malingering while at the same time encourage the recipients of workers' compensation benefits to make efforts to return to the workforce and obtain gainful employment such that they can contribute to their own earnings. *See, e.g.,* S. Legis. J., 1996 Reg. Sess. 2159 (June 19, 1996) (statement of Sen. Loeper) ("[O]ne of the main, key components that we want to look at in the legislation before us today is to provide the payment of benefits only to legitimate claimants."); *id.* at 2169 ("The primary goal is to get people back to work, back to work on their job or another job instead of staying on workers' compensation."). Similarly, Act 57 was viewed as a means of staunching the exponential growth of litigation and related costs following *Kachinski. See, e.g.,* S. Legis. J., 1996 Reg. Sess. 2160 (June 19, 1996) (statement of Sen. Loeper) ("I think the goal also ... is to try to reduce costs associated with litigation and the administration of workers' compensation claims."); *see generally* David B. Torrey, *The Commonwealth Court of Pennsylvania and the Workers' Compensation Act: Background and Jurisprudence, Judge Alexander F. Barbieri, and Selected Precedents,* 20 WIDENER L.J. 87, 132 (2010) (stating that Kachinski "gave rise to significant litigation, and in most cases ... the litigation would be protracted as well" (footnote omitted)).

More specifically, comments made by legislators concerning the job availability provisions of Act 57, including Section 306(b)(2), evidence the intent to relieve employers of the most burdensome requirements of *Kachinski,* such that employers would no longer be required to convey job referrals to a

claimant and that benefits could be modified even if a claimant did not obtain a job offer. *See, e.g.,* H. Legis. J., 1996 Reg. Sess. 1579 (June 19, 1996) (statement of Rep. Belfanti) (explaining that the language concerning job availability "has now been reduced to where a job might be available in a classified ad" and "does not take into account the job being available for the claimant"); *id.* at 1594 (statement of Rep. Surra) (noting that injured workers may "lose their compensation because there is some job out there, there is some classified ad out there that says there is a job that they can do whether that worker gets hired or not"). This intent is also reflected in the altered language of another portion of Section 306(b), which imposes upon a claimant "an obligation to look for available employment" following receipt of a return-to-work notice. *See* 77 P.S. § 512(3)(ii). Under prior law, however, no such obligation existed legislatively, and *Kachinski* stated expressly that a claimant was not subject to this duty. *See Kachinski,* 516 Pa. at 250, 532 A.2d at 379.

Moreover, examining the consequences of a particular interpretation, *see* 1 Pa.C.S. § 1921(c)(6), construing the term "exists" as effectively incorporating the *Kachinski* litmus of individual claimant experience with job openings undermines the core directives of the statute, namely, that the earning power assessment is to be based on work a claimant is "capable of performing" and expert opinion evidence. 77 P.S. § 512(2). It is far more consistent with the overall purport of Act 57 and the language of Section 306(b)(2) to interpret the passage alluding to employment which "exists" as addressing the claimant's vocational and physical capabilities in correlation with the types of jobs found by a workers' compensation judge to exist in the marketplace through an assessment of the required expert opinion evidence. *See* 77 P.S. § 512(2) ("Disability partial in character shall apply if the employe *is able* to perform his previous work or *can* ... engage in any other kind of substantial gainful employment which exists in the usual employment area ..." (emphasis added)).

In this regard, I agree with the Commonwealth Court that, based upon the language of Section 306(b)(2) as well as the

Legislature's primary focus on cost-containment, "the fact that Claimant applied for the jobs identified by Mr. Kimmich and did not obtain an offer of employment is immaterial" to the determination of a claimant's earning power. *Phoenixville Hosp. v. WCAB (Shoap)*, 2 A.3d 689, 697–98 (Pa.Cmwlth.2010). Indeed, the Legislature has limited the factors which a workers' compensation judge may take into account in connection with this assessment by focusing the inquiry on a less personalized evaluation of alternative employment, and, notably, this Court has stated that calculations of earning power based upon a labor market survey are intended to generate only a "fairly accurate approximation" of "a claimant's 'true' earning power." *Riddle v. WCAB (Allegheny City Elec., Inc.)*, 603 Pa. 74, 83, 981 A.2d 1288, 1293 (2009).

The majority finds that individual experience of claimants and actual availability of particular work to them should be considered, in part, since a claimant must be permitted to adduce evidence that positions identified by an employer's expert already have been filled, or that the requirements of such positions are not actually consistent with the claimant's vocational capabilities and medical limitations. *See* Majority Opinion, at 47–48, 81 A.3d at 844–46. I agree with the majority that either or both of these circumstances may be relevant; my difference is that I do not believe that the appropriate way to establish them is through a claimant's testimony concerning her actual experience in pursuing identified jobs. Again, this *Kachinski*-like convention simply is too greatly in tension with Act 57's job-market focus. Moreover, unless claimants are to be permitted to routinely introduce hearsay testimony concerning what they may have learned from prospective employers, they must in any event produce more traditionally admissible evidence concerning the unavailability of a particular job in the marketplace and/or the inconsistency of its requirements with the claimant's vocational capabilities and medical restrictions. *See generally* Foley, Michael J., *Funded Employment and Vocational Rehabilitation Shams Affecting Injured Workers*, 2 Ann. 2000 ATLA–CLE 2845 (2000) (discussing the production of evidence relat-

ed to the fictitious nature of the jobs delineated in a labor market survey or the unsuitableness of such positions in light of the claimant's residual impairment and vocational skills).[3] In my opinion, however, in Act 57's wake, testimony concerning the results of *Kachinski*-like follow-through attempts does not serve as an appropriate method of proof.

In the broader frame, the majority appears to take no issue with the understanding that Section 306(b), on its terms, reflects a job-market litmus for determining earnings power. According to the essential purport of the majority opinion, however, such framework effectively binds only employers, not claimants. *See* Majority Opinion, at 48, 81 A.3d at 844 (sanctioning the admission into evidence of the "claimant's actual experience with the employers identified in the employer's labor market surveys"). Thus, the majority posits, claimants may treat the labor-market evidence as, essentially, a series of *Kachinski*-like job referrals. *See id.* at 48, 81 A.3d at 844 (stating that the employer's expert evidence serves "as a mechanism for providing the claimant with notice of the existence of these jobs, which thus provides a serious opportunity to secure employment"). The majority believes these then may tested, as under the *Kachinski* regime, by claimants undertaking job interviews and adducing evidence of the actual unavailability of jobs to them. Via *reductio ad absurdum* logic, the majority posits, the alternative is to accept that an employer could identify a single open job to establish the earnings power of a multitude of claimants, although only one claimant could actually obtain this employment. *See* Majority Opinion, at 49, 81 A.3d at 845.

From my point of view, the bulk of the majority's rationale is simply too disharmonious with the legislative focus upon the

3. I do not suggest that the gathering of such evidence will be simple; I simply observe that we are not the policymakers here, but rather, are charged with effectuating the will of the General Assembly. It is noteworthy that claimants may also discredit the opinions of an employers' vocational experts by vigorous cross-examination or the presentation of other testimony concerning the underlying factual basis of the expert's opinion, so long as such testimony is within the fair scope of Section 306(b)(2).

job market manifested in Section 306(b)(2) to control. Further, the nature of a labor market survey is broader than the pinpointing of a single job in the marketplace, and no workers' compensation judge would credit, nor would the WCAB or the appellate courts sustain, a modification attempt in the unreasonable scenario envisioned by the majority.

To the degree the majority may regard my position as depriving claimants of the opportunity to demonstrate facts in opposition to modification efforts, it is elemental that evidence of facts must be relevant to be admissible. *See* Pa.R.E. 402. Given that Section 306(b)(2) redirects the focus of the salient aspect of the earnings power assessment to the job market, evidence of the unavailability of particular jobs to a particular claimant (based on whatever myriad range of considerations which individual, discrete employers may deem pertinent to their hiring decisions) is simply no longer relevant under the statutory scheme.[4]

Finally, I agree with the Commonwealth Court that no remand is necessary in this case. The WCJ credited the testimony of Employer's medical and vocational experts and discredited the contrary testimony of Claimant's experts. *See Shoap v. Phoenixville Hosp.*, No. 2556743, *slip op.* at 3–4, ¶¶ 18–19, A–5–6 (Pa. Dept. Labor & Indus., Aug. 29, 2008). Indeed, the WCJ specifically concluded that Employer established that the jobs listed in the labor market survey "were compatible with Claimant's residual functional capacity for work and vocationally suitable for Claimant." *Id.* at 4, ¶ 2, A–6. Thus, Employer carried its burden to demonstrate that

---

4. The exception is evidence that the requirements of particular jobs which may have been identified by an employer's experts exceed the claimant's vocational capabilities and medical limitations, as discussed in the text above.

Again, this case involves purely statutory interpretation, and my position rests largely on a plain-meaning interpretation of Section 306(b)(2). Accordingly, I do not address whether Section 306(b)(2) comports with constitutional norms. I observe only that, to the degree the Legislature has taken and/or takes progressively greater measures curtailing benefits in furtherance of the cost-containment objective, I have no doubt that constitutional challenges will ensue.

Claimant possessed earning power as defined in Section 306(b)(2) such that her benefits should be modified.

Justice EAKIN joins this dissenting opinion.