# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carl Sadler,                                    :
                          Petitioner            :
                                                :
            v.                                  :  No. 1294 C.D. 2020
                                                :  Submitted: June 4, 2021
Philadelphia Coca-Cola (Workers'               :
Compensation Appeal Board),                     :
                          Respondent            :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge


**OPINION BY**
**JUDGE COHN JUBELIRER**                        **FILED:  January 7, 2022**


Carl Sadler (Claimant) petitions for review of the December 1, 2020 Order of the Workers' Compensation Appeal Board (Board) affirming the May 31, 2019 Decision of a Workers' Compensation Judge (WCJ) that granted the Petitions for Modification (Modification Petition) and Termination (Termination Petition) filed by Philadelphia Coca-Cola (Employer) and denied and dismissed the Petitions for Modification, Penalty, Reinstatement, and Review Benefit Offset filed by Claimant. As a result, the WCJ modified Claimant's benefits to reflect that Claimant had an earning capacity of $520.00 per week and partially terminated Claimant's workers' compensation (WC) benefits for work-related injuries from which the WCJ found Claimant had fully recovered. As for Claimant's Petitions, the WCJ concluded that Employer had not improperly taken or handled an offset of Claimant's WC benefits for his receipt of Social Security old age benefits. On appeal, Claimant argues:[1]

---

[1] We have rearranged and consolidated Claimant's arguments for ease of discussion.

(1) Section 204(a) of the Workers' Compensation Act[2] (Act), 77 P.S. § 71(a), which sets forth an offset for the receipt of Social Security old age benefits, is unconstitutional; (2) the WCJ erred in relying on the labor market survey (LMS), earning assessment, and deposition testimony of Employer's vocational expert, Michael Smychynsky; (3) the WCJ erred in not considering Claimant's status as a Class II felon when determining whether a position was appropriate and/or open and available to Claimant; and (4) the WCJ's Decision did not meet the reasoned decision requirements of Section 422(a) of the Act, 77 P.S. § 834.

## I. BACKGROUND

### A. Current Petitions

On July 2, 2012, after working for Employer for just four weeks, Claimant sustained the following work-related injuries, which Employer accepted: "a right pinky finger amputation," "distal radioulnar joint subluxation, ECU tendinopathy, pisotriquetral joint arthritis resulting in pisiform excision, right wrist DRUJ resection" (upper extremity injuries), and "right transverse process fractures of L2-3 and L4, contusion to the right gluteal region/right hip, fracture of the right 6th rib and right leg radiculitis, . . . and low back sprain" (non-upper extremity injuries). (WCJ's Decision, Findings of Fact (FOF) ¶¶ 1-2.) Claimant received "temporary disability benefits in the amount of $652.00 based on an average weekly wage [(AWW)] of $978.00."[3] (*Id.* ¶ 1.)

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 71(a).

[3] Claimant would later file a Petition to Review challenging the calculation of the AWW, and Employer would later file a Petition to Suspend Claimant's WC benefits for a period to account for the 525 days during which Employer paid Claimant while he was incarcerated prior to trial due to his inability to post bail, was convicted, and sentenced to time served. In *Sadler v. Workers' Compensation Appeal Board (Philadelphia Coca-Cola)*, 210 A.3d 372, 379, 383-84 (Pa. Cmwlth. **(Footnote continued on next page…)**

2

Employer filed the Termination Petition on November 9, 2016, asserting that Claimant was fully recovered from the non-upper extremity injuries based on a September 15, 2016 Independent Medical Examination (IME) by Armando Mendez, M.D. Employer later filed the Modification Petition on April 27, 2017, averring that based on Smychynsky's vocational interview and earning power assessment "Claimant had a weekly earning capacity of $520.00 as of March 31, 2017." (*Id.* ¶ 4.) Claimant filed an Answer to the Modification Petition, denying all of the material allegations, maintaining that Claimant remained totally disabled, and asserting that the results of Smychynsky's earning capacity assessment could not be considered because Smychynsky and Employer's carrier did not comply with the Bureau of Workers' Compensation Regulations (Regulations). (*Id.* ¶ 4; Certified Record (C.R.) Item 6.)

On October 30, 2017, Employer's third-party administrator (TPA) issued an Amended Notice of Workers' Compensation Benefit Offset (Amended Notice of Offset)[4] advising that an "offset would be taken due to Claimant's receipt of Social Security old age benefits," which would include a period of recoupment to recover an overpayment of WC benefits. (*Id.* ¶ 9.) Claimant filed various petitions, including the Petition to Review Benefit Offset (Review Petition), asserting that the offset violates the Act, Employer failed to exercise due diligence when it did not

---

2019) (*Sadler I)*, this Court reversed the WCJ's decision granting the suspension petition and remanded for consideration of Claimant's probable overtime. The Supreme Court affirmed in *Sadler v. Workers' Compensation Appeal Board (Philadelphia Coca-Cola Co.)*, 244 A.3d 1208 (Pa. 2021) (*Sadler II)*. While Employer was unsuccessful in obtaining the suspension of Claimant's WC benefits, litigation on Claimant's challenge to the AWW is ongoing.

[4] The TPA issued a prior notice of offset, to which Claimant filed multiple petitions in response. (FOF ¶¶ 5, 7.) Employer later acknowledged that the offset amounts were incorrect, which led to the issuance of the Amended Notice of Offset. (*Id.* ¶ 5.)

"send Claimant LIBC Employment Verification forms" periodically, and Section 204(a) of the Act is unconstitutional.  (*Id.* ¶ 10.)  Employer denied the allegations.

### B. Proceedings Before the WCJ

All of the Petitions were assigned to the WCJ, who held hearings at which Employer and Claimant presented the following evidence.

### 1. Employer's Evidence

Dr. Mendez, who is a board-certified orthopedic spine surgeon, performed IMEs on Claimant on May 22, 2015, and September 15, 2016, and testified by deposition as follows.[5]  Dr. Mendez examined Claimant's non-upper extremity injuries, reviewed Claimant's medical records and diagnostic records, and observed no objective evidence to support Claimant's ongoing complaints.  Thus, Dr. Mendez opined that Claimant's non-upper extremity injuries had resolved and required no further treatment, and Claimant could return to work at the same capacity as before the relevant work injuries.  (*Id.* ¶ 13(g), (j).)  In addition, "Dr. Mendez would not impose any restrictions on Claimant's ability to return to work with regard to [those] diagnoses[.]"  (*Id.* ¶ 13(j).)  Accordingly, Dr. Mendez completed an Affidavit of Recovery for the non-upper extremity injuries.  (*Id.* ¶ 13(k).)  Dr. Mendez noted, on Claimant's physical capacities form, that there could be restrictions placed on Claimant by other physicians for the upper extremity injuries.  In addition, Dr. Mendez observed that  Claimant had a slightly antalgic gait at the September IME, which Dr. Mendez attributed to Claimant's "left knee not fully extending" and that Claimant reported having "unrelated left knee arthroplasty."  (*Id.* ¶ 13(i).)

---

[5] Dr. Mendez's deposition testimony is found at Item 34 of the Certified Record and is summarized in Finding of Fact 13.

Stephanie Sweet, M.D., "a board-certified orthopedic surgeon with an added qualification in surgery of the hand," testified by deposition in support of Employer's Modification Petition as follows.[6] (*Id.* ¶ 14(a).) Dr. Sweet performed two IMEs on Claimant. The June 23, 2015 IME revealed recent right-hand surgery related to the work injury from which Claimant was still recovering. Dr. Sweet opined that therapy for the hand was proper at that time, Claimant was continuing to improve, and light-duty work was appropriate. (*Id.* ¶ 14(e).) At the August 2, 2016 IME, Claimant advised Dr. Sweet that the surgery had helped, Claimant had been discharged from the care of the hand surgeon, and Claimant could use the right hand to do things so long as it was not overused. Based upon the physical examinations and a review of updated medical records, Dr. Sweet concluded that Claimant had reached maximum medical improvement for the upper-extremity injuries and "permanent light-duty status was appropriate." (*Id.* ¶ 14(h).) Dr. Sweet described Claimant's physical capacities as being "up to 20 pounds of either lifting or carrying on an occasional basis and 10 pounds regularly" and being able to "push and pull about 10 pounds with anything that is repetitive of force with the right hand." (*Id.*) Dr. Sweet also testified about reviewing the job analyses provided by Smychynsky, as set forth below.

Smychynsky, "a vocational rehabilitative consultant[,] . . . forensic vocational economist," and certified rehabilitation counselor with 28 years of experience, testified by deposition.[7] (*Id.* ¶ 15(a).) Prior to Smychynsky testifying, Claimant objected to the results of that earning power assessment being considered based on

---

[6] Dr. Sweet's deposition testimony is found at Item 35 of the Certified Record and is summarized in Finding of Fact 14.

[7] Smychynsky's deposition testimony is found at Items 32 and 33 of the Certified Record and is summarized in Finding of Fact 15.

various alleged violations of the Regulations. (Smychynsky's Deposition (Dep.) at 5.) Smychynsky then testified as follows. There is no financial interest between Smychynsky and Smychynsky's company and Employer or the TPA. Smychynsky "provided to Claimant a disclosure form indicating the purpose of the evaluation and . . . notify[ing] Claimant of the lack of counselor-client relationship, as required by the . . . Act." (*Id.* ¶ 15(d).) In assessing whether work with Claimant's medical releases and vocational abilities was available, Smychynsky reviewed the medical reports of Dr. Mendez and Dr. Sweet and the Notices of Ability to Return to Work that Employer subsequently sent. In addition, Smychynsky interviewed Claimant and obtained information about Claimant's medical condition and treatment, education, military service, work history, computer skills, driving ability, and hobbies, including those which required use of the injured right hand. Following the interview, Smychynsky completed a transferable skills analysis and determined that Claimant's vocational alternatives "were cashier jobs and jobs like that of a security guard, a traffic control worker[,] and some assembly positions." (*Id.* ¶ 15(i).) Smychynsky checked with Employer to see if there were any positions within Claimant's restrictions and abilities available and there were none. Smychynsky performed the LMS to find appropriate positions, identified 23 specific positions, and performed specific job analyses for 5 of those positions to determine if they were consistent with Claimant's work releases.

These five positions were as follows: (1) a full-time, light-duty position as "a security gate attendant with G4S Security Services" paying $13.00 per hour, which allowed for standing, sitting, walking, and driving, change of position as needed, and minimal use of upper extremities; (2) a full-time, light-duty flagger position with Flagger Force paying $11.50 per hour, which required lifting of up to 25 pounds and

6

walking and standing during the workday; (3) a full-time, light-duty position as a production associate with US Vision/Recaf Optical (US Vision) paying between $12.00 and $14.00 per hour, which had minimal lifting and was mostly sitting, and could be modified to reduce the lifting requirements from 25 pounds to 20 pounds; (4) a full-time or part-time, sedentary position as an offsite cashier and van dispatcher for Smart Park paying $10.00 per hour; and (5) a full-time or part-time, sedentary to light-duty position as a gate attendant with St. Joseph's University paying $12.00 per hour that required some standing and walking and allowed for the employee to change positions, but also required a security clearance, which, Smychynsky acknowledged, could affect Claimant's ability to obtain this position due to Claimant's post-work-injury conviction of a Class II felony. (FOF ¶ 15(k), (o), (bb), (cc); Smychynsky's Dep. Part 1 at 39-40, 42-43, 45-46, 48, 51.) Smychynsky sent job analysis forms for the five positions to Dr. Mendez and Dr. Sweet. Smychynsky received the forms back from Dr. Mendez, of which the WCJ found that Dr. Mendez had approved the GS4 Security Services, St. Joseph's University, and Smart Park positions, but approved the US Vision position only if modified to reduce lifting from 25 pounds to 20 pounds. (FOF ¶ 15(k), (o), (bb), (cc); Smychynsky's Dep. Part 1 at 39-40, 42-43, 45-46, 48, 51; Smychynsky's Dep. Part 2, Ex. Smychynsky-5.) Dr. Sweet testified that the positions were within Claimant's restrictions, except that the positions with US Vision and Flagger Force required modification to reduce the lifting requirement from 25 pounds to 20 pounds. (FOF ¶ 14(i)-(m).)

Smychynsky observed the positions, directly communicated with the five employers, and confirmed the continued availability of the positions between March 28, 2017, and April 12, 2017. In Smychynsky's opinion, these positions were

7

"vocationally appropriate given Claimant's education and vocational history" and were open and available at the time of the earning capacity evaluation. (*Id.* ¶ 15(hh).) Based on the identified positions, "Smychynsky opined that Claimant ha[d] an entry-level earning capacity of up to $520.00 per week" using the "highest paying position for 40 hours per week." (*Id.* ¶ 15(ii).) Smychynsky acknowledged, however, that if Claimant's conviction was considered, "the security positions would likely not be appropriate for Claimant." (*Id.* ¶ 15(jj).)

### 2. Claimant's Evidence

Claimant offered the deposition testimony of Jed Shapiro, M.D., a board-certified anesthesiologist with whom Claimant treats for pain management, who testified as follows.[8] Dr. Shapiro provides outpatient chronic pain management and approximately half of Dr. Shapiro's practice is the treatment of lumbar spine injuries. Dr. Shapiro began treating Claimant on August 20, 2015, has continued to do so through August 2017, and "considers himself Claimant's primary treating physician for Claimant's lumbar spine injury of July 2, 2012." (*Id.* ¶ 16(b).) At the initial evaluation, Claimant complained of neck and low back pain, as well as pain from the low back into the right leg and ankle that Dr. Shapiro opined were consistent with injuries to the L4-5 nerve roots. The physical examination results indicated nerve root irritation and problems with the lower lumbar spine. Dr. Shapiro evaluated Claimant multiple times between August 2015 and August 2017, with Claimant continuing to complain of low back pain and similar results during the physical examinations. Based on the examinations and review of Claimant's medical records and diagnostic testing of the lumbar and cervical spine, Dr. Shapiro

---

[8] Dr. Shapiro's deposition testimony is found at Item 27 of the Certified Record and is summarized in Finding of Fact 16.

opined that Claimant was not fully recovered from the non-upper extremity injuries, continued treatment was needed for those injuries, and Claimant could not return to the time-of-injury position with Employer. Dr. Shapiro released Claimant "to work with restrictions to avoid prolonged sitting and standing, frequent bending, pushing, pulling[,] and to refrain from . . . lifting greater than 10 pounds." (*Id*. ¶ 16(m).) Of the five positions, Dr. Shapiro would only approve the Smart Park cashier position, provided that Claimant worked two to four hours per day a few days a week to start and then gradually increased the hours as Claimant could tolerate.

Claimant also offered the deposition testimony of John Dieckman, "the assistant director of vocational services at Proto-Worx, a disability management company," and certified rehabilitation counselor and disability management specialist, who testified as follows.[9] (*Id*. ¶ 17(a).) Dieckman reviewed Smychynsky's evaluation and the identified positions approximately eight or nine months after that LMS. Dieckman interviewed Claimant on October 31, 2017, discussing Claimant's background, felony conviction, work history, ability to drive, and limitations due to the multiple surgeries on Claimant's right hand. Citing Dr. Shapiro's reports and restrictions and Claimant's interview, Dieckman believed Claimant had a limited ability to work and "need[ed] a position where [Claimant could] sit and stand and change positions" and "could probably lift 10 pounds but not more than that." (*Id*. ¶ 17(e).) Dieckman reviewed the positions identified by Smychynsky, contacted the employers' representatives (some of which were unavailable or had left), and concluded that the positions were inappropriate, inconsistent with the restrictions of Dr. Shapiro and Dr. Mendez, or would be unavailable because of Claimant's conviction. Dieckman additionally questioned

---

[9] Dieckman's deposition testimony is found at Item 28 of the Certified Record and is summarized in Finding of Fact 17.

whether some of these positions' physical requirements were as Smychynsky described, would have been available at the pay levels asserted, and/or were permanent or guaranteed positions.

Claimant testified before the WCJ on February 15, 2018, as follows.[10] Claimant described the July 2, 2012 work incident, the injuries sustained, the related ongoing medical treatment, and his ongoing problems with the low back, right hip, right leg, and right foot and ankle, as well as the right wrist and hand. Claimant acknowledged having received Dr. Mendez's and Dr. Sweet's return to work releases and the Notices of Ability to Return to Work. Claimant discussed returning to work with Dr. Shapiro, who, according to Claimant, placed a 10-pound carrying restriction and limited Claimant's use of the right hand. Upon receiving Smychynsky's LMS, even though he did not feel the jobs were consistent with Dr. Shapiro's restrictions, Claimant applied and received some responses, but no job offers. (*Id.* ¶ 18(h); Ex. C-4.) Claimant also applied for other full-time positions at that time, despite being uncertain that they could be performed without accommodation by the employers and received no job offers from these attempts. Claimant acknowledged he was incarcerated after the work injury and pleaded guilty to a Class II felony. (*Id.* ¶ 18(k).) Claimant advised the potential employers of this conviction, which imposes "restrictions on how close he can be to certain public facilities and he is not permitted to be around certain types of people." (*Id.*) Claimant is receiving Social Security old age benefits, which have reduced his WC benefits. Claimant also submitted paystubs showing Employer's withholding for Social Security and Medicare. (*Id.* ¶ 19; Ex. C-3.)

---

[10] The February 15, 2018 hearing transcript is found at Item 24 of the Certified Record, and Claimant's testimony is summarized in Finding of Fact 18.

*C. The WCJ's Decision*

In addition to the above findings of fact, the WCJ made the following credibility determinations. The WCJ found Dr. Mendez's testimony credible and persuasive and supported the finding that "Claimant is capable of gainful employment and is fully recovered from [the] non-upper[]extremity . . . injuries," citing Dr. Mendez's credentials, comprehensive medical evaluations, the lack of objective findings in Claimant's physical examination making Claimant's complaints of pain inconsistent, and the lack of support in the objective testing. (FOF ¶ 21.) The WCJ also found Dr. Sweet's testimony credible and persuasive and supported the finding that "Claimant is capable of gainful employment within [Dr. Sweet's] restrictions concerning Claimant's right upper extremity injury," citing Dr. Sweet's credentials, comprehensive examinations, and the fact that those opinions were unrebutted. (*Id.* ¶ 22.) In contrast, the WCJ found Dr. Shapiro's testimony less credible than that offered by Dr. Mendez and Dr. Sweet, citing the facts that Dr. Shapiro does not treat and could offer no opinion on Claimant's upper extremity injuries, is a pain management physician who relies on his patients' subjective complaints of pain, provided work restrictions that changed when presented with positions that met the original restrictions, and the additional restrictions were not mentioned even by Claimant as having been imposed. (*Id.* ¶ 24.)

As for the vocational experts, the WCJ found Smychynsky's testimony "credible in its entirety," noting Smychynsky's comprehensive interview of Claimant, review of the medical records, personal observation of the identified positions, and concession when certain of the positions identified were not consistent with Claimant's medical restrictions. (*Id.* ¶ 23.) Thus, the WCJ accepted Smychynsky's opinion "that Claimant is capable of earning $520.00 per week."

(*Id.*)  The WCJ did not find Dieckman's testimony credible or persuasive, stating that although "Dieckman criticized [] Smychynsky's evaluation," Dieckman "did not contact the identified employers until eight months after the [LMS] was performed," relied on Dr. Shapiro's two- to four-hour per day restriction, "which is not realistic for most employers," and on Dr. Mendez's restrictions but "Dr. Mendez provided no restrictions on Claimant's ability to return to work." (*Id.* ¶ 25.)  Finally, the WCJ noted that Dieckman focused on Claimant's felony conviction when that conviction occurred after the work injury and that "Employer should not be hindered by Claimant's subsequent behavior and conviction." (*Id.*)

The WCJ found Claimant's testimony "not credible or persuasive on the relevant issues." (*Id.* ¶ 26.)  According to the WCJ, notwithstanding Claimant's release to work by Dr. Shapiro, he "only applied for jobs during the month immediately following [the] issuance of the [LMS]" and cited the "conviction as to why many of the positions are not available." (*Id.*)  The WCJ explained "[i]t is not Employer [that] should be hindered by that conviction which occurred after the work injury," "[t]he consequences of this felony belong to Claimant." (*Id.*)

Based on these credibility determinations, the WCJ found, in pertinent part:

d)  As of March 31, 2017, there were numerous employment positions available that fit within Claimant's physical and vocational capabilities as outlined by . . . Smychynsky.

e)  Claimant's earning power, based on the positions identified by . . . Smychynsky, is $520.00 per week.

f)  Claimant has fully recovered from [the non-upper extremity] . . . injuries . . . .

g)  Employer has been appropriately taking a credit for Claimant's receipt of Social Security old age benefits.

12

h) There is no bar to Employer's right to a credit for Claimant's receipt of Social Security old age benefits due to Claimant only working for Employer for four weeks.

(*Id.* ¶ 27(d)-(h).)  For these reasons, the WCJ concluded that Employer had met its burdens of proof on the Modification and Termination Petitions and Claimant did not establish that the offset for Claimant's receipt of Social Security old age benefits was inappropriate or handled improperly.  (WCJ's Decision, Conclusions of Law (COL) ¶¶ 2-4.)  Thus, the WCJ granted the Modification and Termination Petitions and denied Claimant's Review Petition.[11]

### D. The Board's Opinion

Claimant appealed to the Board, asserting many of the same arguments as he makes before this Court.  The Board rejected Claimant's argument that "Section 204(a) violates the [e]qual [p]rotection [c]lause of the Pennsylvania Constitution,[12] explaining that it presumed the Act's provisions are constitutional and that this Court previously held that Section 204(a)'s Social Security old age benefits offset did not violate equal protection.  (Board Opinion (Op.) at 5 (citing *Caputo v. Workers' Comp. Appeal Bd. (Commonwealth of Pa.)*, 34 A.3d 908, 919 (Pa. Cmwlth. 2012)).)

The Board also held that the WCJ did not err in finding the conviction not relevant because "[l]imitations from non-job-related injuries are not a factor to be considered" to establish earning power under Section 306(b) of the Act, 77 P.S. § 512.  (*Id.* at 18 (citing *Markle v. Workmen's Comp. Appeal Bd. (Caterpillar*

---

[11] The WCJ also denied Claimant's other Petitions, which Claimant does not challenge.

[12] The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.  Article I, section 1 of the Pennsylvania Constitution states that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."  PA. CONST. art. I, § 1.

*Tractor Co.)*, 661 A.2d 1355, 1358 (Pa. 1995)).) The Board also rejected Claimant's argument that Smychynsky's testimony and earning power assessment should not have been considered due to a violation of the Regulations, finding Claimant did not preserve this issue by submitting it in a separate writing to the WCJ as required by Section 131.66(b) of the Special Rules of Administrative Practice and Procedure Before WCJs (WCJ Rules), 34 Pa. Code § 131.66(b), as Claimant's counsel had agreed to do during the deposition. (*Id.* at 19-20 (citing *Degraw v. Workers' Comp. Appeal Bd. (Redner's Warehouse Mkts., Inc.)*, 926 A.2d 997, 1001 (Pa. Cmwlth. 2007)).)[13]

Finally, the Board rejected Claimant's argument that the WCJ's Decision was not reasoned because the Decision summarized the evidence, made credibility determinations that were explained and did not leave the WCJ's reasoning up to the imagination, made the necessary findings and conclusions to support the ultimate decision, and viewing the credibility determinations as a whole, such determinations were not arbitrary and capricious. The Board found no error in rejecting Dieckman's testimony because it was based on the later-conducted LMS, and not made during the time period relevant to the Modification Petition. The Board also disagreed with Claimant's argument that there was inconsistency in Dr. Mendez's testimony that Claimant was fully recovered from the non-upper extremity injuries and the on-the-job analyses forms, which noted that several jobs did not meet Claimant's physical restrictions. The Board held that Dr. Mendez clearly opined that Claimant was fully recovered from the non-upper extremity injuries and could return to work with no restrictions related thereto but also recognized that "[s]ome restrictions may be placed by other physicians for upper extremity injuries," which is what occurred

---

[13] Nonetheless, the Board stated that it would not consider this to be an error. (Board Op. at 21 n.9.)

14

here. (*Id.* at 24 (quoting Ex. D-Mendez-3).) The Board stated that Dr. Mendez did not testify about any of the positions and that, other than the notes on the job analyses, all other evidence supported full recovery. The Board disagreed that the WCJ had to explain how these notes fit into the credibility determinations because the WCJ is not required to give a line-by-line analysis of each piece of evidence and statement made. Based on the findings made and the explanations given, the Board held that the WCJ's Decision provided for effective appellate review and, therefore, satisfied the requirements of Section 422(a) of the Act.

Accordingly, the Board affirmed the WCJ's Decision and Order. Claimant now petitions this Court for review. [14]

## II. DISCUSSION

### A. *Whether Section 204(a) of the Act is Unconstitutional.*

#### 1. Parties' Arguments

Claimant argues that the WCJ erred in denying the Review Petition because Section 204(a)'s automatic 50% offset for the receipt of old age benefits violates the Equal Protection Clauses of the United States and Pennsylvania Constitutions because it does not pass the rational relationship test. According to Claimant, Section 204(a) creates three classifications of injured workers, those who receive: (1) old age benefits, (2) severance benefits, and (3) pension benefits. Unlike severance and pension benefits, whose offset is based on the benefits or contributions made by the employer directly liable for the payment of WC benefits, Claimant argues that the offset for injured workers who receive Social Security old

---

[14] This Court's scope of review "is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated." *Elberson v. Workers' Comp. Appeal Bd. (Elwyn, Inc.)*, 936 A.2d 1195, 1198 n.2 (Pa. Cmwlth. 2007).

15

age benefits after the work injury is not bound by how much the employer funds those benefits. Claimant argues the interest found to support the severance and pension offset, duplicative benefits for the same loss of earnings, is not present where, as here, the employee has only worked for an employer for a short time and the short-term employer was not responsible for funding the bulk of the employee's old age benefits. Claimant argues that *Caputo* did not consider whether the difference between the three types of offset violated equal protection. Claimant further asserts the amount an employer funds an employee's Social Security old age benefits is readily discernable from an employee's pay stubs and providing an offset equal to that amount provides the desired cost containment result without being unduly burdensome on the injured, short-term worker.

Employer responds that there is no equal protection violation because Section 204(a) does not create a classification for an unequal distribution of benefits or imposition of burden, and, without a classification, there can be no equal protection violation. *McCusker v. Workmen's Comp. Appeal Bd. (Rushton Mining Co.)*, 639 A.2d 776, 778 (Pa. 1994). Employer notes that all three benefit offset provisions have been found not to violate the equal protection clause per *Kramer v. Workers' Compensation Appeal Board (Rite Aid Corp.)*, 883 A.2d 518 (Pa. 2005) (severance), *Caputo*, 34 A.3d at 919 (old age benefits), and *Mosley v. Workers' Compensation Appeal Board (City of Pittsburgh)*, 937 A.2d 607 (Pa. Cmwlth. 2007) (pension). Employer argues that, assuming *arguendo* that there is a classification, Claimant's challenge still fails because there is a legitimate state interest met in this case – cost containment for employers, and the classification, the 50% offset, is reasonably related to the articulated state interest, as the Court held in *Caputo*. According to Employer, Section 204(a) was "[c]arefully crafted, [so that] each offset entitle[s] the

16

employer to decrease its [WC] liability based on other payments that the injured worker would receive based on non-injury considerations," and "the Legislature chose a 50% offset for the [S]ocial [S]ecurity 'old age' benefits as a fair approximation of an employer's contribution as noted [in *Caputo*]." (Employer's Br. at 18.) Employer asserts that severance and pension benefit offsets are, "on the other hand, . . . calculated based upon the occasioned employment benefits paid to the employer directly liable for payment of compensation" and "[i]t would be unfair for an injured worker to go on [WC] a short time before he/she retires and collects more on pension, [WC,] and Social Security with absolutely no intentions of returning to work." (*Id.* at 18-19.)

2. Analysis

Section 204(a) states, in relevant part:

> Fifty per centum of the benefits commonly characterized as "old age" benefits under the Social Security Act (49 Stat. 620, 42 U.S.C. §[§] 301[-1397mm],) shall also be credited against the amount of the payments made under sections 108 and 306,[15] except for benefits payable under section 306(c): Provided, however, That the Social Security offset shall not apply if old age Social Security benefits were received prior to the compensable injury. The severance benefits paid by the employer directly liable for the payment of compensation and the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award made under sections 108 and 306, except for benefits payable under section 306(c).

77 P.S. § 71(a). Claimant asserts that employers that take an offset for Social Security old age benefits may do so at 50% of those benefits but employers that take

---

[15] 77 P.S. §§ 271, 511-514. Section 108 was added by Section 1 of the Act of October 17, 1972, P.L. 930.

offsets for severance and pension benefits may only do so to the extent that the employer funded those benefits, which treats claimants differently without a legitimate governmental purpose to justify the difference.

> In reviewing equal protection challenges, we apply the following principles:
>
> The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly. However . . . [t]he right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment and does not require equal treatment of people having different needs. The prohibition against treating people differently under the law **does not preclude the Commonwealth from resorting to legislative classifications provided that those classifications are reasonable rather than arbitrary and bear a relationship to the object of the legislation.**

*Kramer*, 883 A.2d at 532 (alterations in original) (emphasis added). First, the court considers whether the statute creates a classification for the unequal distribution of benefits or burdens. *Id.*

In *Caputo*, we addressed an equal protection challenge to the Social Security old age benefits offset based on its exclusion of Social Security old age benefits that were received prior to the work injury from being offset. Reviewing this provision, we determined that Section 204(a) created a legislative classification for the unequal distribution of benefits - claimants to whom the offset applies or does not apply - based on when they began receiving Social Security old age benefits. *Caputo*, 34 A.3d at 915. While Employer here asserts that no classification between claimants is created, Section 204(a)'s language imposes different offset amounts for different claimants based on the claimants' receipt of a particular type of benefit. These offsets affect the amount of WC benefits those claimants receive, just like the classification between those claimants whose Social Security old age benefits began

18

prior to the work injury (no offset) and those whose began after the work injury (offset). Thus, we conclude Section 204(a) creates a legislative classification for unequal distribution of benefits or burdens. Therefore, we turn to the next step of the equal protection analysis, which is to determine the appropriate standard of review. *McCusker*, 639 A.2d at 778.

There are three levels of review in an equal protection analysis: strict scrutiny, applied where the right involved is fundamental or a suspect classification has been made; heightened or intermediate scrutiny, applied where the right involved is important, but not fundamental, or a sensitive classification is made; or rational basis, applied where the alleged equal protection violations do not implicate the other standards. *Id.* The parties agree that the rational basis standard applies. The Court's review of a government regulation related to social welfare benefits, like WC benefits, is deferential. *McCusker*, 639 A.2d at 779. Legislative classifications subject to rational basis scrutiny enjoy a strong presumption of validity. *Kramer*, 883 A.2d at 534. When applying the rational basis test,

> we determine whether the challenged statute seeks to promote any legitimate state interest or public value; and if so, we then determine whether the legislative classification is reasonably related to accomplishing that articulated state interest . . . . This deferential standard recognizes the legislative prerogative to "define the scope and the duration of the entitlement to . . . benefits, and to increase, decrease, or to terminate those benefits based on its appraisal of the relative importance of the recipients' needs and the resources available to fund the program.

*Caputo*, 34 A.3d at 916 (quoting *Bowen v. Guillard*, 483 U.S. 587, 598 (1987)). Legislation "in this area will not be deemed to violate equal protection merely because the classification drawn is imperfect . . . . The classification need only be directed at the accomplishment of a legitimate government interest, and to do so in

19

a manner which is not arbitrary or unreasonable." *Id.* (alteration in the original) (internal quotations and citations omitted).

In *Caputo*, we applied the rational basis test to the equal protection challenge to the Social Security old age benefits offset. Initially, we explained that "[t]he legislature has made the policy decision that because the employer helps to fund Social Security, it should receive a credit towards [WC] disability." *Id.* at 912. We observed that under the rational basis standard, "the General Assembly need not specifically articulate the purpose or rationale supporting its action"; rather, "[i]t is enough that some rationale may conceivably be the purpose and policy underlying the enactment." *Id.* at 917 n.15. Accordingly, "courts are free to hypothesize reasons why the legislature created the particular classification at issue and, if some legitimate reason exists, the provision cannot be struck down, even if its soundness or wisdom might be deemed questionable." *Id.*

With regard to the legitimate governmental interests at issue in Section 204(a), we held

> [t]he Supreme Court has . . . identified one legitimate governmental interest underlying all of the offsets in Section 204(a): "Reasonable [WC] cost containment for employers, and the concomitant competitive benefit such cost containment offers for Pennsylvania businesses." [*Kramer*,] . . . 883 A.2d at 535.[] We identify a second legitimate governmental interest to this particular offset: to encourage individuals collecting Social Security retirement benefits to remain in or reenter the workforce.[]

*Caputo*, 34 A.3d at 917 (footnotes omitted). The Court concluded that the challenged legislative classification was reasonably related to the articulated governmental interests, reasoning:

> [p]ermitting an employer to offset [WC] disability benefits by 50% of an employee's Social Security retirement benefit is reasonably related

to reducing the employer's [WC] costs. If the employer is self-insured, the reduction is obvious because it is direct. Every dollar offset is a dollar in savings to the employer. The cost reduction to privately insured employers is less direct; however, [WC] insurance premiums "are based at least in part on past payment experience." *Kramer*, . . . 883 A.2d at 535-36. Reducing the amount of compensation claims ameliorates the employer's future premiums. . . .

*Caputo*, 34 A.3d at 917. In rejecting the claimant's argument that WC benefits and Social Security old age benefits were not duplicative, and, therefore, did not implicate cost containment, we again found the Supreme Court's reasoning in *Kramer*, a challenge to the severance offset, persuasive, stating:

> there is nothing irrational or arbitrary in offsetting severance benefits, irrespective of whether the employer is self-insured or privately insured. *The worker experiences only one loss of earnings at a time, even if there is a prospect of compensation for that loss from multiple sources. The offset does not disadvantage the injured worker vis a vis his uninjured colleagues who also receive severance benefits* because those workers do not receive a double benefit, in the form of [WC] payments, from the employer. Because the employment relationship is the basis for providing both severance payments and [WC] benefits (whether or not the compensation is paid through an outside insurer), the employer can avoid paying duplicate benefits for the same loss of earnings by using the offset. We conclude that the severance benefit offset bears a rational relationship to achieving the legislative goals.

[*Kramer*], 883 A.2d at 535 (emphasis added).

> The Supreme Court's above-stated rationale is equally applicable to this case. The employment relationship is the basis for providing both [WC] benefits and Social Security retirement benefits. The latter benefit is traceable to the Social Security tax contribution every employer makes toward its employees' social security retirement. **The General Assembly recognized that the employer's contribution is only partial by enacting a 50% offset rather than a dollar for dollar**

**offset. The 50% offset is not a perfect fit because a claimant may have a long work history with multiple employers. In such a case, the last employer would benefit even though it was not the employer that made all of the contributions** to the Social Security trust fund on behalf of the employee. **Legislative classifications are not required to be perfect to pass constitutional muster**.

The General Assembly chose a 50% offset as a fair approximation of the employer's contribution because of the burden to tailor the offset in each individual case to the actual Social Security tax contributions made by an employer for the employee subject to the offset. Further, former employers will benefit by having the offset apply where they, in turn, have a short history with an employee who is injured and then retires. The goal of the 50% offset is to achieve fairness to the group of all Pennsylvania employers. Statutory regulation of social welfare benefits "does not violate the Equal Protection Clause because the classifications drawn are imperfect; if the classification has a reasonable basis, it does not offend the Constitution." *McCusker*, . . . 639 A.2d at 780. It is not for this Court to speculate as to whether Section 204(a)'s 50% offset is the wisest or best means to accomplish the legitimate legislative goal of cost containment. Indeed, there are an infinite array of policy choices the legislature could have made with respect to [WC] benefits. It could have decided that [WC] disability, which is intended to replace an injured worker's earning power, should end as soon as that employee retires. After all, other employees, who are not injured before retirement, are limited to their Social Security and retirement pension. In its wisdom, however, the legislature has decided that [WC] should continue post-retirement, recognizing that many retirees wish to work well into their retirement. So long as a work injury deprives the claimant of the opportunity to earn income, compensation benefits continue.

*Caputo*, 34 A.3d at 917-18 (bold emphasis added). Thus, this Court found that the legislative classification satisfied the rational basis test and rejected the claimant's equal protection challenge.

Claimant asserts that *Caputo* did not address the same challenge as that raised here and, therefore, is not binding. While *Caputo* did not address an equal protection challenge to the different offsets based on the type of benefit a claimant receives, we

22

conclude its reasoning nonetheless supports the same result here. Claimant's challenge is based on the belief that the amount an employer funds a particular employee's Social Security old age benefits can be discerned from the employee's wage statements, pointing to his own four weeks of pay stubs as evidence. If those amounts are discernible, Claimant contends, they should be treated the same as severance and pension benefits, which would satisfy the legitimate government interest of cost containment and avoid an equal protection violation. While the Legislature could have used the same language for calculating the Social Security old age benefit offset as it did for the other offsets had it wanted the parties to have to engage in the mathematical exercise Claimant posits is possible and should be performed, it did not.

As we explained in *Caputo*, the use of the 50% offset was in recognition of an employer's partial contribution to the Social Security trust fund, and, while "not a perfect fit," it was "a fair approximation of the employer's contribution" made to avoid "the burden to tailor the offset in each individual case to the actual Social Security tax contributions made by an employer for the employee subject to the offset."[16] *Id.* at 917-18. "Legislative classifications **are not required to be perfect** to pass constitutional muster." *Id.* at 918 (emphasis added). Using the 50% offset was an effort to achieve fairness for all Pennsylvania employers by acknowledging that there may be some situations where an employer benefits from the offset and some where they would not, depending on the length of the employment relationship. *Id.* The same issue is generally not present in the severance or pension offset situation, which focuses on the relationship between a particular employer and

---

[16] Given this statement in *Caputo*, we question Claimant's premise, based on the four-week work experience here, that every employer's contributions to every employee's Social Security old age benefits would be so easily discernable.

23

its injured employee and how that particular employer funded the **employer-provided** benefit. As the Court may hypothesize a reason for why a particular legislative classification was created that is legitimate, we conclude the above reasons support the difference here. *Id.* at 917 n.15. For these reasons, we discern no violation of Claimant's equal protection rights by Employer's taking the Section 204(a) offset for Claimant's Social Security old age benefits. Accordingly, the WCJ did not err in denying Claimant's Petitions.

> *B. Whether the WCJ Improperly Considered Smychynsky's Testimony and Report in Granting the Modification Petition.*

> 1. Parties' Arguments

Claimant argues that Smychynsky and/or Employer did not comply with the Regulations and therefore, Smychynsky's earning assessment and deposition should not have been considered. Specifically, Claimant asserts that Smychynsky testified that the vocational report was sent only to Employer's insurer, not to Claimant and Claimant's counsel, and there is no indication that Smychynsky had generated a written initial report detailing the expert's involvement in the litigation and conclusions from the interview within 30 days, in violation of Section 123.204(b), (c) of the Regulations, 34 Pa. Code § 123.204(b), (c). Claimant testified he did not receive any assessments in the mail or letters from Smychynsky that identified jobs. Claimant further argues that Smychynsky admitted to being unaware of whether Employer had forwarded a financial interest disclosure to Claimant as required by Section 123.205 of the Regulations, 34 Pa. Code § 123.205, and that no such document is in Claimant's file. Claimant further asserts that, contrary to the Board's conclusion, these arguments are not waived because they were raised in the Answer to the Modification Petition, as well as during Smychynsky's deposition and Claimant's testimony.

Employer replies that the Board properly found these objections to be waived as a result of Claimant's failure to preserve them in writing as required by Section 131.66(b) of the WCJ Rules, by which Claimant's counsel agreed to abide at the beginning of Smychynsky's deposition. For this reason and the fact that Claimant did not otherwise articulate the substance of the objections, Employer contends, the WCJ did not address them and properly considered Smychynsky's report and deposition. Even if preserved, Employer argues that the record reflects that there were no violations because Smychynsky's report shows Claimant and Claimant's counsel were copied on the report, and the testimony upon which Claimant relies related to the job analysis forms sent to Dr. Mendez and Dr. Sweet, which is not subject to the Regulation. Further, Employer asserts there was no financial interest at issue and, therefore, no disclosure was required.

2. Analysis

We address the waiver argument first. Section 131.66 of the WCJ Rules governs the "[a]dmissibility of oral depositions," and subsection (b) provides that "[o]bjections shall be made and the basis for the objections stated at the time of the taking of the depositions" and "[o]nly objections which are identified in a separate writing, introduced prior to the close of the evidentiary record, . . . stating the specific nature of the objections and the pages where they appear in the deposition . . . will be preserved for ruling." 34 Pa. Code § 131.66(b). Any "[o]bjections not so preserved are waived." *Id.*; *see also Degraw*, 926 A.2d at 1001 (finding any issue not preserved as required by Section 131.66(b) was waived).

While the record confirms that Claimant did not submit a separate, written list of the objections to Smychynsky's testimony and earnings analysis, Claimant expressly raised the alleged violation of the Regulations in the Answer to the

Modification Petition. Therein, Claimant stated: "[i]t is believed and therefore averred that the [WCJ] may not consider the results of . . . Smychynsky's Earning Power Assessment as [Smychynsky] failed to comply with Section 123.204 of the Regulations, and the involved [WC] Carrier failed to comply with Section 123.205 of said Regulations." (Answer to Modification Petition, C.R. Item No. 6.) Claimant's challenge to the consideration of Smychynsky's earning power assessment was not related to anything particular to Smychynsky's testimony or the deposition, but was a defense to the Modification Petition based on the alleged noncompliance with the Regulations. Thus, it is not clear whether this provision, which focuses on the admissibility of oral deposition, applies here. Second, this objection (defense) was brought to the WCJ's, as well as Employer's, attention at the earliest moment in this matter, was repeated during Smychynsky's deposition, and Claimant's counsel indicated at the final hearing that there were objections to Smychynsky's materials contained therein. (WCJ Hearing Transcript (Hr'g Tr.), Feb. 15, 2018, at 4, C.R. Item 24.) Under these circumstances, particularly where Claimant raised this defense to the Modification Petition itself - Employer's reliance on Smychynsky's earning power assessment - in writing in Claimant's Answer, we conclude Claimant sufficiently preserved his challenge based on the alleged noncompliance with Sections 123.204 and 123.205 of the Regulations. However, upon review of the record, we, like the Board, discern no violation of these provisions that would require reversal.

Section 123.203(c) of the Regulations provides that a WCJ "may not consider the results of an earning power assessment interview if the [WCJ] finds that the vocational expert has not complied with [Section] 123.204 . . . or that the insurer has not complied with [Section] 123.205." 34 Pa. Code § 123.203(c). Claimants "bear

26

the responsibility of raising the issue of a vocational expert's alleged failure to comply with" the Regulations "as a defense to a modification before the WCJ." *Kleinhagan v. Workers' Comp. Appeal Bd. (KNIF Flexpak Corp.)*, 993 A.2d 1269, 1275-76 (Pa. Cmwlth. 2010). "Once this is done, the burden should shift to the employer to establish" compliance with the Regulations. *Id.* at 1276.

Section 123.204(b) provides that "[a] vocational expert who conducts an earning power assessment interview shall generate a written initial report detailing the expert's involvement in the litigation and conclusions from the interview," and "shall serve a copy of the initial report on the employee and counsel, if known, within 30 days of the date of the interview." 34 Pa. Code § 123.204(b). Although Claimant cites testimony that Smychynsky only sent reports and job analysis forms to Employer's TPA and/or Dr. Mendez and Dr. Sweet to review, (Smychynsky's Dep. Part 1 at 93; Smychynsky's Dep. Part 2 at 114), the record reflects otherwise. Both Claimant's counsel and Claimant were carbon copied, along with Employer's counsel, on the Earning Capacity Assessment, which set forth Smychynsky's role in the litigation, conclusions from the interview, review of the medical materials, and the LMS, including a list of the 23 positions identified. (Smychynsky's Dep. Part 2, Ex. Smychynsky-4.) Claimant's receipt of the Earning Capacity Assessment is confirmed by Claimant's own testimony and Claimant's Exhibit C-04, which show that Claimant received the materials and followed through with applying for many of those positions. (FOF ¶ 18(h); Feb. 25, 2018 Hr'g Tr., Ex. C-04.) While the Earning Capacity Assessment may have been sent more than 30 days after Claimant's interview,[17] it was sent immediately following the completion of

---

[17] Employer asserts there is no violation because Claimant's attorney "received a February 24, 2017 report from [Smychynsky] as he was supposed to have sent [to Claimant] within 30 days **(Footnote continued on next page…)**

27

Smychynsky's search for available positions. Under these circumstances, and because Claimant does not assert any prejudice from the delay, we discern no error in the WCJ's consideration of Smychynsky's materials on this basis.

Section 123.204(c) provides that "[a] vocational expert who authors additional written reports, including earning power assessments or labor market surveys, shall simultaneously serve copies of these written reports upon the employee and counsel, if known, when the expert provides the written reports to the insurer or its counsel." 34 Pa. Code § 123.204(c). Claimant argues that Smychynsky violated this provision, again citing Smychynsky's testimony that reports and job analyses were sent only to Employer's TPA and/or for Dr. Mendez and Dr. Sweet to review. (Smychynsky's Dep. Part 1 at 93; Smychynsky's Dep. Part 2 at 114.) However, as discussed above, the Earning Capacity Assessment reflects that it was sent to Claimant and Claimant's counsel, and Claimant admitted to receiving that report. (Smychynsky's Dep. Part 2, Ex. Smychynsky-4; FOF ¶ 18(h); Feb. 25, 2018 Hr'g Tr., Ex. C-04.) As for the job analysis forms and accompanying letters that were sent to Dr. Mendez and Dr. Sweet, these are not subject to this Regulation because they are not "written reports," 34 Pa. Code § 123.204(c), authored by Smychynsky, but were inquiries sent to the IME physicians to determine whether the identified positions were consistent with those physicians' work releases for Claimant. (Smychynsky's Dep. Part 2, Exs. Smychynsky-5, C-Smychynsky-3.) Accordingly, we discern no error in the WCJ's consideration of Smychynsky's testimony and reports on this basis.

---

of the vocational interview[,]" which "was appropriately copied to Claimant and his attorney." (Employer's Br. at 26-27.) However, we cannot consider this factual statement because the record does not include this alleged report. *Indem. Ins. Co. of N. Am. v. Bureau of Workers' Comp. Fee Rev. Hearing Off. (Insight Pharm.)*, 245 A.3d 1158, 1165 (Pa. Cmwlth. 2021).

Finally, Section 123.205(b) of the Regulations state that "[b]efore an insurer refers an employee for an earning power assessment interview, the insurer shall disclose to the employee, in writing, **any financial interest** the insurer has with the person or entity conducting the earning power assessment interview." 34 Pa. Code § 123.205(b) (emphasis added). This regulation must be read consistently with Section 306(b)(2.1) of the Act, which provides that "[i]f an insurer refers an employe for an earning power assessment **and the insurer has a financial interest** with the person or in the entity that receives the referral, **the insurer shall disclose that financial interest** to the employe prior to the referral." 77 P.S. § 512(2.1) (emphasis added). This language supports Employer's argument that if there is **no financial interest present**, there is nothing to be disclosed.[18] Here, based on Smychynsky's testimony, the WCJ found that there was no financial interest between Employer or its representative and Smychynsky or his business. (FOF ¶ 15(a).) As such, no disclosure was required prior to the interview. For these reasons, the WCJ was not precluded from considering Smychynsky's materials on this basis.

### C. Whether the WCJ Should Have Considered Claimant's Conviction in Determining Claimant's Residual Productive Skill and Whether the Identified Positions were Actually Open and Available to Claimant.

#### 1. Parties' Arguments

Claimant argues that the WCJ erred in not considering the conviction, and the resulting employment restrictions, which made some of the positions identified not actually open and available to Claimant, as part of Claimant's residual productive skill. Claimant asserts that the term "residual productive skill," as used in Section 306(b)(2), should be read broadly to include factors other than a claimant's physical

---

[18] While not binding, it appears that the Board interprets Section 123.205(b) the same way. *See Ware v. Pa. State Sys. of Higher Educ.* (Pa. Work. Comp. App. Bd., A14-0323, filed Sept. 24, 2015), 2015 WL 5898562, at *8-9.

29

restrictions associated with the work-related injury. According to Claimant, Section 306(b)(2) required the WCJ to examine his "condition at the time 'earning capacity' is being challenged[,]" to determine Claimant's residual productive skill, which here includes Claimant's status as a Class II felon. (Claimant's Br. at 46.) Claimant likens this matter to *Kolenkiewicz v. Workers' Compensation Appeal Board (SKF USA, Inc.)*, 730 A.2d 1054, 1057 (Pa. Cmwlth. 1999), in which Claimant contends this Court held that an employer had to show that a criminal conviction would not prevent a position from being available. Claimant asserts Smychynsky acknowledged that the security guard positions were not appropriate given the conviction and that any position that required a background check was more likely than not unavailable to Claimant and, therefore, should not have been considered.

Employer argues there was no error in the WCJ's conclusion that Claimant's conviction, which occurred after the work injury, was not relevant to Claimant's residual productive skill and whether the jobs identified were open and available to Claimant. According to Employer, it need not show that any of the prospective jobs would accommodate any of Claimant's non-work-related physical limitations to meet its burden, *Markle*, 661 A.2d at 1358, and the same principle should be applied to other non-physical factors or limitations that occurred after and are unrelated to the work injury. Further, Employer argues, the mere fact that a criminal background check is required does not necessarily mean that a position is automatically unavailable to Claimant. For these reasons, Employer asserts it should not be additionally burdened to identify employment within the limitations associated with Claimant's post-work injury, criminal conviction.

2. <u>Analysis</u>

Section 413 of the Act authorizes an employer to modify a claimant's WC benefits if it proves that "the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased." 77 P.S. § 772. Pursuant to this section, "when an employer seeks to modify a claimant's benefits by a reduction, suspension, or termination of such benefits, the employer must first come forward with medical evidence of a change in the claimant's physical condition that correspondingly establishes a change in the claimant's 'disability[,]'" which means the loss of earning power. *Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap)*, 81 A.3d 830, 841 (Pa. 2013).

Section 306(b)(2) of the Act addresses earning power and partial disability, and provides, in relevant part:

> "Earning power" shall be determined by the work the employe is capable of performing and shall be based upon expert opinion evidence which includes job listings with agencies of the department, private job placement agencies and advertisements in the usual employment area. Disability partial in character shall apply if the employe is able to perform his previous work or can, considering the **employe's residual productive skill,** education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employe lives within this Commonwealth. . . . If the employer has a specific job vacancy the employe is capable of performing, the employer shall offer such job to the employe. In order to accurately assess the earning power of the employe, the insurer may require the employe to submit to an interview by a vocational expert who is selected by the insurer and who meets the minimum qualifications established by the department through regulation.

77 P.S. § 512(2) (emphasis added). "Earning power under Section 306(b) is unmistakably based on the employer's evidence of the claimant's ability to engage in existing 'substantial gainful employment' within his or her physical, medical, and

31

vocational restrictions or skills, not on whether he or she actually receives a job offer." *Phoenixville Hosp.*, 81 A.3d at 842. Unless the employer has an appropriate position, Section 306(b)(2) "does not require that the claimant be offered a job in order to establish the claimant's earning power." *Id.* However, in determining whether an employer meets its burden of proof, "[t]he jobs identified by the employer's expert witness that the claimant is 'capable of performing' must thus be those jobs that are actually open and potentially available, not simply jobs that are already filled with existing employees." *Id.* This may be established through the testimony of a vocational expert. 77 P.S. § 512(2).

Here, the WCJ found that Employer met its burden of proof based on Smychynsky's credited expert opinion that Claimant had an earning power of $520.00 per week, which was based on a 40-hour work week at the highest paid position available to Claimant, which was the G4S Security Services position that was vocationally appropriate and open and available. (FOF ¶¶ 15(k), (hh), (ii), (jj), 27(e); COL ¶ 2.) Claimant challenges the reliance on any of the security positions because they were not "available" due to his conviction, which is now a part of his "residual productive skill." 77 P.S. § 512(2). Accordingly, the question before the Court is what role, if any, Claimant's Class II felony conviction plays in determining whether Employer met its burden of proving that there were appropriate, available jobs within Claimant's "physical, medical, and vocational restrictions or skills." *Phoenixville Hosp.*, 81 A.3d at 842. The WCJ and Board held the conviction has no impact on what Employer must prove because it occurred after the work injury and was not related thereto. We agree.

Claimant relies on the phrase "residual productive skill" as used in Section 306(b)(2), 77 P.S. § 512(2), which he contends must take into account his Class II

32

felony conviction. This phrase is not defined by the Act and is a separate consideration from a claimant's "education" and "work experience." *Id.* A claimant's "productive skill" is modified by the word "residual," which is undefined by the Act but may be defined as meaning "remaining; leftover." Black's Law Dictionary 1424 (9th ed. 2009).[19] We read "residual" to refer to the productive skill that remains or is leftover **as a result of a claimant's work-related injury** and **without consideration of any non-work-related factors** that arose **after** the work injury. This reading is consistent with precedent, which focus on the work-relatedness of any limitations, as well as on the timing of the events that may affect a claimant's ability to return to work.

In *Sheehan v. Workmen's Compensation Appeal Board (Supermarkets General)*, 600 A.3d 633, 636 (Pa. Cmwlth. 1991), we rejected a claimant's argument that the referee[20] erred in refusing to consider the medical limitations related to the claimant's **subsequent**, **non-work-related** heart attack in granting the employer's modification petition. We explained that the inquiry into the appropriateness and availability of a position for the purposes of a modification petition reviews only the **limitations** that **are the result of the work injury** and does not "include those physical limitations resulting from a non-work-related injury with no [causal] connection to the prior work-related injury []or which are related to physical limitations existing prior to the injury." *Id.* at 632. To hold otherwise "would require the employer to compensate an employee for injuries **occurring away from the job during the period that the employee is recovering** from his or her work-related

---

[19] Under Section 1903(a) of the Statutory Construction Act of 1972, words shall be given their common and approved usage, 1 Pa.C.S. § 1903(a), and where words are undefined by the statute, the courts may look to dictionary definitions to do so, *Cox v. Johnstown Housing. Authority*, 212 A.3d 572, 580 (Pa. Cmwlth. 2019).

[20] Prior to 1996, WCJs were called referees.

33

injury," and "[t]he intent of [t]he . . . Act is to compensate only work-related injuries or those [causally] connected thereto." *Id.* (emphasis added).

In *Markle*, our Supreme Court applied *Sheehan* to consider whether an employer had to consider a preexisting medical condition, unrelated to the work injury, in meeting its burden of proving job availability. There, the claimant sustained a work-related back injury, was cleared to return to restricted work, and the employer assigned the claimant to a position with no loss of earnings but in a different area of the employer's facility. However, due to a preexisting, non-work-related condition, the claimant could not work in the assigned area, refused the position, and sought reinstatement of his WC benefits. The referee denied reinstatement, finding that the employer had made a position within the work-related restrictions available, which the claimant had rejected. The Board and this Court affirmed. The Supreme Court also affirmed, observing that WC was intended to replace "common law tort actions between employees and employers as a means for obtaining compensation for injuries," and that "claimant[s] may only collect for those injuries arising out of [their] employment." 661 A.2d at 1357. Finding that the employer had met its burden of proving job availability, so as to defeat reinstatement, the Supreme Court explained, citing *Sheehan*, that while a claimant's physical limitations are a factor to be considered, **only those limitations causally related to the work injury** and that did not preexist **can be used to determine job availability under the Act**. *Id.* at 1358. The Supreme Court agreed with *Sheehan* that holding otherwise would be inconsistent with the Act by requiring an employer to compensate a claimant for non-work-related conditions while the claimant was recovering from the work-related injuries. *Id.* The Supreme Court found further

34

support for its conclusion in Section 413(a) of the Act,[21] which allowed for reinstatement of benefits "unless it be shown that the loss of earnings does not result from the disability due to the injury." *Id.* at 1360. Because the employer had made a job within the claimant's work-related restrictions and with no loss of earnings available, the claimant's loss of earnings was not the result of the work injury and he was not entitled to WC benefits. *Id.*

The Supreme Court later, in *Schneider, Inc. v. Workers' Compensation Appeal Board (Bey)*, 747 A.2d 845 (Pa. 2000), described an employer's burden of proving job availability for purposes of the suspension of benefits as follows. "If an employer can establish that there is a job available **that complies with an employee's remaining work-related physical injuries**, and the employee fails to return to or accept this **position because of non[-]work-related factors**, the employer has proven that the employee's loss of earnings is attributable to something other than the work-related injury." *Id.* at 849 n.9 (emphasis added). In that case, the claimant was cleared to return to sedentary work from the work injury but was unable to perform any work because of a devastating non-work-related injury sustained after the work injury. Under that situation, the Supreme Court held the employer did not have to establish job availability within the claimant's work-related restrictions because it would be futile given the claimant's non-work-related injuries.

---

[21] Section 413 of the Act provides, in pertinent part, that:

A [WCJ] designated by the department may, at any time, modify, reinstate, suspend, or terminate a notice of compensation payable, an original or supplemental agreement or an award of the department or its [WCJ], upon petition filed by either party with the department, upon proof that the disability of an injured employe has increased, decreased, recurred or has temporarily or finally ceased.

77 P.S. § 772.

35

Although these cases did not involve a modification pursuant to an LMS, the common theme throughout is that, for a limitation on a claimant's ability to work generally or on the availability of a particular position to be considered by a WCJ, **the limitation must be related to the work injury**, particularly if the limitation **arises from events occurring after the work injury**. Applying this analysis to Claimant's argument that "residual productive skill" requires consideration of his post-injury conviction renders that argument without merit. Requiring that for a limitation to be considered a part of a claimant's "residual productive skill" it must be related to the claimant's work injury and not occur after the work injury gives meaning to the word "residual" by ensuring that the productive skill being considered is that which remains or is left over from the work injury. Otherwise, Employer would be responsible for compensating Claimant for his inability to obtain higher paying work based on limitations that arose **after** the work injury and were unrelated to that injury. Imposing such an obligation on Employer would be inconsistent with the Act's intent as set forth by this Court in *Sheehan* and approved by the Supreme Court in *Markle*. Applying this limitation to modifications pursuant to an LMS is consistent with these cases and the Act's intent. Here, it is not disputed that the cited limitations to Claimant's employment prospects relate to his Class II felony conviction that occurred after the work injury and that are completely unrelated to the work injury. As the claimed limitations are not causally related to Claimant's work injuries, but to his own after-the-fact actions, we agree with the Board that this conviction "has no bearing on the [LMS] and earning power assessment performed by" Employer. (Board Op. at 18.)

Although Claimant relies on *Kolenkiewicz*, that case does not require a different result. First, unlike here, the claimant there had been convicted of a crime

in 1969, **decades** before he sustained a work injury in 1988 and left work in 1995, for which the claimant received wage loss benefits. Thus, if a conviction was to be considered a part of the claimant's "productive skill," the conviction in that case existed prior to the work injury and, consequently, could be viewed as part of the claimant's "remaining" productive skill after the work injury. Second, the Court did not clearly hold, as Claimant argues, that an employer must show that a conviction does not automatically bar the claimant from the position relied upon by the employer because it requires a background check. Rather, we explained that "**[a]ssuming**, *arguendo*, that the [e]mployer had the burden to prove [that the c]laimant's conviction did not automatically bar [the c]laimant from being considered for the job," the employer's evidence "was sufficient . . . to establish that the job was available to [the c]laimant" because it indicated that a criminal conviction did not automatically exclude an applicant from consideration. 730 A.2d at 1056-57 (emphasis added). Thus, we held that **if** the employer had to show this, the employer had, in fact, met its burden. Accordingly, *Kolenkiewicz* does not require reversal.

Because requiring the WCJ to consider non-work-related injury limitations that were the result of actions that occurred after the work-related injury as part of Claimant's "residual productive skill" in determining whether a position identified by an employer is appropriate and/or open and available is inconsistent with the caselaw and the Act's intent, we discern no error in the WCJ's decision not to do so here.

*D. Whether the WCJ's Decision is Reasoned as Required by Section 422(a) of the Act.*

1. Parties' Arguments

Claimant raises two arguments that claim the WCJ did not issue a reasoned decision as required by Section 422(a) of the Act. First, Claimant argues that there is an inconsistency in Dr. Mendez's testimony and opinions, citing Findings of Fact 13 and 21, in which the WCJ summarized and credited Dr. Mendez's testimony regarding Claimant's full recovery and ability to return to the time-of-injury, heavy-duty position, and Finding of Fact 15(m), (o), in which the WCJ found that Dr. Mendez had disapproved 2 of the positions identified for Claimant by Smychynsky because they required lifting of over 20 pounds and 1 position required Claimant to stand for more than 4 hours. Claimant argues the WCJ never addressed the inconsistency in Dr. Mendez finding Claimant fully recovered and releasing Claimant for full duty, while simultaneously disapproving positions as not being physically appropriate for Claimant to perform. According to Claimant, that Dr. Sweet opined that Claimant could not lift more than 20 pounds occasionally, did not, as the Board reasoned, support Dr. Mendez's limitation based on standing for more than 4 hours.

Second, Claimant argues the WCJ's explanations for rejecting Dieckman's testimony, that he had not contacted the potential employers until eight months after the LMS had been completed and that the positions did not meet Dr. Mendez's restrictions where, according to the WCJ, no such restrictions existed, do not satisfy the reasoned decision requirements of Section 422(a). Claimant maintains that the timing of Dieckman's inquiry "does not render the opinion of suitability for [Claimant] less credible, nor should it render the [t]estimony any less credible if it was determined that the jobs NEVER existed, as described in the" LMS.

(Claimant's Br. at 51.) Additionally, Claimant points out that, notwithstanding Dr. Mendez's opinion of full recovery, Dr. Mendez did not approve 2 of the 5 identified positions because they required lifting of more than 20 pounds and 1 position because it required standing for more than 4 hours, an inconsistency that invalidates the WCJ's rejection of Dieckman's testimony.

Employer argues the WCJ's Decision is reasoned and disputes that Dr. Mendez's opinions were "diametrically opposed." (Employer's Br. at 28.) Employer asserts that Dr. Mendez's restrictions were consistent with the reviewed medical reports and records in that the lifting restrictions were imposed by Dr. Sweet, and the standing restriction was supported by Claimant's non-work-related surgery on the left knee. Such restriction, Employer maintains, is not inconsistent with Dr. Mendez's opinion that Claimant was fully recovered from the non-upper extremity injuries, which were to Claimant's right side. Employer further points out that Dr. Mendez never testified regarding the job analyses, beyond saying Claimant had no restrictions related to the non-upper extremity injuries; rather, those approvals or approvals with modification were introduced during Smychynsky's testimony and exhibits. With Dr. Mendez not testifying on these points or authenticating the notes on the job analyses forms as his own, Employer contends the WCJ was not required to consider those notes as creating an inconsistency, particularly where a decision does not require a line-by-line analysis of the evidence presented in order to be reasoned.

As for the WCJ's rejection of Dieckman's testimony, Employer asserts there was no error or violation of the reasoned decision requirements. Employer argues that the WCJ explained the reasons for rejecting that testimony and it is uncontested that Dieckman did not contact the identified employers until eight months after

39

Smychynsky completed the LMS. Employer further contends that this was but one of the reasons the WCJ gave for rejecting Dieckman's testimony, and the other reasons, including that Dieckman relied on Dr. Shapiro's restriction and on Claimant's Class II felony conviction, were supported by the record. According to Employer, the WCJ's detailed explanations of the credibility determinations are not arbitrary or capricious and are supported by the record and, therefore, satisfied the reasoned decision requirement, which is not intended to allow parties to challenge or second-guess the WCJ's credibility determinations. (*Id.* at 35-36.)

2. Analysis

Section 422(a) of the Act provides that all parties in a WC case are "entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." 77 P.S. § 834. A decision of a WCJ is "reasoned" if it allows for meaningful appellate review without further elucidation. *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052 (Pa. 2003). "[W]hile summaries of testimony alone would be insufficient to satisfy the reasoned decision requirement, where a WCJ summarizes testimony and also objectively explains [the WCJ's] credibility determinations, the decision will satisfy the requirement." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 76 (Pa. Cmwlth. 2012). In addition, a WCJ cannot simply ignore uncontroverted evidence but, rather, must adequately explain the reasons why the WCJ has rejected such evidence. 77 P.S. § 834. The reasoned decision requirement "does not require the WCJ to give a line-by-line analysis of each statement by each witness, explaining how a particular statement affected the ultimate decision."

40

*Gumm v. Workers' Comp. Appeal Bd. (J. Allan Steel)*, 942 A.2d 222, 228 (Pa. Cmwlth. 2008) (quoting *Acme Mkts., Inc. v. Workers' Comp. Appeal Bd. (Brown)*, 890 A.2d 21, 26 (Pa. Cmwlth. 2006)). A reasoned decision challenge "does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations," and those determinations will be upheld on appeal unless they were made arbitrarily or capriciously. *Hershgordon v. Workers' Comp. Appeal Bd. (Pepboys, Manny, Moe & Jack)*, 14 A.3d 922, 928 (Pa. Cmwlth. 2011) (quoting *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006)). This is because "the WCJ is the ultimate fact finder and is empowered to determine witness credibility and evidentiary weight. The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Id.* (quoting *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000)). Reviewing the WCJ's Decision, we conclude it is reasoned because it clearly and concisely states and explains the WCJ's rationale, objectively explains the credibility determinations, which are supported by the record and are not arbitrary and capricious, and allows for meaningful appellate review.

With regard to Dr. Mendez's testimony, the WCJ provided multiple reasons for finding Dr. Mendez more credible than Dr. Shapiro, (FOF ¶¶ 21, 24), but Claimant challenges that determination based on what he contends is an inconsistency in Dr. Mendez's "imposed" restrictions. We discern no inconsistency that would render the WCJ's Decision not reasoned as required by the Act. Dr. Mendez **unequivocally testified** that Claimant was **fully recovered** from the work-related non-upper extremity injuries and could **return to work without restrictions related to those injuries** and completed an affidavit of recovery for those injuries.

41

(Mendez's Dep. at 32-34, 61-62; FOF ¶ 13(j), (k).) Dr. Mendez's September 15, 2016 Physical Capacities Form for Claimant clearly recognized that additional restrictions could be imposed by another physician for the upper extremity injuries. (Mendez's Dep., Ex. D-Mendez-3.) Dr. Sweet imposed those restrictions, and Dr. Mendez's recognition of the 20-pound lifting restriction in his review of the job analyses was not inconsistent with his finding Claimant fully recovered from the non-upper extremity work injuries. (Smychynsky's Dep. Part 2, Ex. Smychynsky-5.) As for the alleged four-hour-per-day standing limitation for the Flagger Force position, unlike the other four positions, the WCJ did **not** find that Dr. Mendez approved the position. (*Compare* FOF ¶ 15(k), (o), (bb), (cc), *with* ¶ 15(m).) Dr. Mendez was not questioned about the notations on the job analysis forms during his deposition, which were attributed to him during Smychynsky's deposition. Given the lack of finding, it does not appear that the WCJ considered, or credited, any of the alleged restrictions on the Flagger Force position attributed to Dr. Mendez. Further, as Employer points out, and the WCJ found, Dr. Mendez noted at the September 15, 2016 IME that Claimant recently had non-work-related surgery on the left knee, which caused a limited range of motion, an antalgic gate, and a slight limp. (FOF ¶ 13(i); Mendez's Dep. at 26-27, 29.) Given Dr. Mendez's recognition of Claimant's left knee surgery, assuming that the written notation on the job analysis form is Dr. Mendez's, it is not "diametrically" opposed to and inconsistent with Dr. Mendez's finding of full recovery from the right-sided work injuries, such that the WCJ was ignoring uncontroverted evidence that the restriction was related to the work injury thereby rendering the WCJ's credibility determination arbitrary and capricious. Absent an arbitrary and capricious credibility finding, the WCJ's credibility determination will be upheld on appeal. *Hershgordon*, 14 A.3d at 928.

42

Accordingly, this is not a basis upon which to conclude that the WCJ's Decision was not reasoned.

As for Claimant's challenge to the rejection of Dieckman's testimony, the WCJ offered many reasons for finding Dieckman less credible than Smychynsky, (FOF ¶ 25), but Claimant challenges only the WCJ's reliance on the facts that Dieckman performed his LMS eight months later and disqualified some positions based on "Dr. Mendez's restrictions," where the WCJ found that Dr. Mendez had placed no restrictions on Claimant's return to work. (*Id.*) Claimant argues that the eight-month difference between the LMSs is not a basis for rejecting Dieckman's testimony. For this Court to overturn a credibility determination, it must be arbitrary and capricious. *Hershgordon*, 14 A.3d at 928. Many of Dieckman's criticisms of Smychynsky's LMS were based on his being unable to contact the same individuals at the identified employers and questioning and/or identifying exactly what positions were available and when. These criticisms relate, at least in part, to the timing of the inquiries because positions that may have been available in March and April 2017, when Smychynsky performed his LMS, may have not been available or had changed in November 2017, when Dieckman performed his LMS. That the two vocational experts performed their studies months apart is not an arbitrary and capricious reason for rejecting Dieckman's testimony.

As for the rejection of Dieckman's testimony based on his reliance on Dr. Mendez's restrictions where no such restrictions were imposed, we read this reason as being related to restrictions imposed for the non-upper extremity injuries, the only specific injuries about which Dr. Mendez had testified. The WCJ found that Dr. Mendez did not impose any restrictions based on the non-upper extremity injuries because Claimant was fully recovered therefrom. (FOF ¶ 13(g).) This is supported

by Dr. Mendez's testimony, report, and affidavit of recovery. While the record contains some reference to Dr. Mendez setting forth other restrictions, which appear to be unrelated to the non-upper extremity injuries, the WCJ is not required to perform a line-by-line analysis of all of the evidence presented. Taken as a whole, we are not left to guess the reasons why the WCJ rejected Dieckman's testimony, which are supported by the record and are not arbitrary and capricious.

Because the WCJ's Decision clearly and concisely explains the WCJ's rationale, provides objective reasons for the credibility determinations, which are supported by the record and not arbitrary and capricious, and allows for meaningful appellate review, it is reasoned for purposes of Section 422(a). Accordingly, this is not a basis for reversing.

## III. CONCLUSION

In sum, Section 204(a) of the Act does not violate the Equal Protection Clauses of the United States and Pennsylvania Constitutions because it is rationally related to a legitimate government interest - cost containment - and is a reasonable means of achieving that interest. The WCJ did not err in considering Smychynsky's testimony and report or in not finding that Claimant's Class II felony conviction had to be considered in determining whether Employer met its burden of showing that the identified jobs were appropriate and/or open and available to Claimant. Finally, the WCJ's Decision satisfied the reasoned decision requirement of Section 422(a) of the Act. Accordingly, the Board's Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

44

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carl Sadler,                  :
           Petitioner      :
                             :
           v.             :    No. 1294 C.D. 2020
                             :
Philadelphia Coca-Cola (Workers'  :
Compensation Appeal Board),     :
           Respondent   :

# O R D E R

**NOW**, January 7, 2022, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge